# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *ex rel.* Christina LaValley, | ) | |
| | ) | |
| Plaintiffs/Relator, | ) | **Case No.** 3 ᴷᵞ 1 2 ··· 0 3 1 7 |
| | ) | **FILED UNDER SEAL** |
| v. | ) | Pursuant to 31 U.S.C. § 3730 |
| | ) | (False Claims Act) |
| | ) | |
| | ) | **JURY DEMAND** |
| [UNDER SEAL] | ) | |
| | ) | |
| Defendants. | ) | |

## DOCUMENT TO BE KEPT UNDER SEAL

FILED

2012 MAR 29 PM 3: 12

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.* Christina LaValley,<br><br>      Plaintiffs/Relator,<br><br>      v.<br><br>WANG VISION INSTITUTE, PLLC<br><br><br><br>Ming Xu Wang, M.D.,<br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. **3  12 - 0317**

**FILED UNDER SEAL**
Pursuant to 31 U.S.C. § 3730
(False Claims Act)

**JURY DEMAND**

## COMPLAINT AND JURY DEMAND

## TABLE OF CONTENTS

**I.  INTRODUCTION** ...................................................................................................1

**II.  JURISDICTION AND VENUE** ..........................................................................2

**III. THE PARTIES** ........................................................................................................2

**IV. THE FALSE CLAIMS ACT** ................................................................................4

**V.  MEDICARE** ............................................................................................................4

    *A.  Overview* ............................................................................................................4

    *B.  Physicians Services* ..........................................................................................5

    *C.  Medical Necessity* .............................................................................................7

    *D.  Coverage Determinations* ...............................................................................10

    *E.  Evaluation and Management Services Coding versus General Ophthalmology Services Coding* .................................................................................................12

    *F.  Regulatory Requirements for Eye Surgery* .....................................................18

        *1.  General Requirements* ...............................................................................18

        *2.  Global Surgery Packages* ..........................................................................19

        *3.  Lacrimal Punctal Occlusion with Punctal Plugs* ......................................21

        *4.  Cataract Surgery* .......................................................................................24

        *5.  Yttrium Aluminum Garnet ("YAG") Capsulotomy Procedure* ...................26

**VI.  FACTS COMMON TO ALL COUNTS AND OVERVIEW OF FRAUDULENT ACTIONS BY DEFENDANT WVI AND ITS AGENTS (INCLUDING DEFENDANT WANG)** ....................................................................................27

**VII. FACTS** .................................................................................................................30

    *A.  Dr. Wang and the Wang Vision Institute, PLLC* .............................................30

    *B.  Relator's Tenure Working at Defendant WVI* .................................................30

        *1.  Illegal and Fraudulent Billing Practices and Medicare Violations* ...........30

Case 3:12-cv-00317   Document 1   Filed 03/29/12   Page 3 of 76 PageID #: 3

*2. The Corcoran Consulting Group Audit* ..................................................33

*3. After the Corcoran Audit, Defendants Continued to Intentionally Violate Medicare Regulations and Submit Illegal Bills for Reimbursement*...........35

*4. Audit by Riva Lee Asbelle & Associates* ...................................................36

**C. Defendant Wang and Defendant WVI Used a Preset Protocol Designed to Increase Medicare Reimbursement Rates Instead of Treating Patients and Billing Medicare According to Medical Necessity**........................................37

**D. Evaluation & Management Violations**.................................................................41

*1. Improper Upcoding of Services to the Level of E/M Services* ...................41

*2. Improper Execution of E/M Physician Visits and Chart Documentation*...................46

**E. Non-Credentialed Physicians Performing Services on Medicare Patients and Billing Medicare Under Wang's Name and Billing Number**.........................48

**F. Lacrimal Punctal Occlusion: Violations of Medical Necessity, Surgical Performance, Billing Practices**..........................................................................49

*1. Defendants Wang and WVI Violated Medicare Regulations and State Laws by Allowing Unlicensed, Non-Physicians to Perform Punctal Plug Surgery on Patients* ...............................................................................................49

*2. Violations of Medical Necessity in Diagnosing and Treating Dry Eye Syndrome with Punctal Plugs* ..................................................................50

*3. Charging Medicare for Improper Office Visits* .........................................53

**G. Defendant WVI Violated Medical Necessity While Performing Patient Services and In Its Billing Methods, Both of Which Resulted in the Defendants Submitting Fraudulent Bills to Medicare** .......................................................56

*1. Performance of First and Second Eye Cataracts Surgeries When Not Medically Necessary* ...............................................................................57

*2. Performing YAG Capsulotomies at an Excessive Rate and Prior to When Medically Necessary* ...............................................................................61

*3. Improperly Charging Medicare for An Additional Office Visit to Diagnose Cataracts and Convince Patients That Cataract Surgery Was Necessary By Using a Secondary Diagnosis*..................................................................62

ii

  *4. The Creation of a "Master List" of Diagnoses and Corresponding Diagnostic
   Tests, Using This List to Bill Medicare for Medically Unnecessary Tests &
   Improper Documentation of Diagnostic Tests* ............................................................. 64

**VIII. COUNT I** ................................................................................................................... 68

**IX. COUNT II** ................................................................................................................ 69

**X.  PRAYER FOR RELIEF** ................................................................................................ 69

**XI. DEMAND FOR JURY TRIAL** ...................................................................................... 71

Case 3:12-cv-00317 Document 1 Filed 03/29/12 Page 5 of 76 PageID #: 5

# I. INTRODUCTION

1.    Relator-Plaintiff Christina LaValley, by and through undersigned counsel, brings this False Claims Act Complaint, on behalf of the United States of America against Defendants Wang Vision Institute, PLLC ("WVI") and Ming Wang, an individual (collectively referred to as "the Defendants").

2.    This action is brought by Plaintiff to recover civil penalties and treble damages under the False Claims Act ("FCA").  31 U.S.C. §§ 3729-33.

3.    Defendant intentionally defrauded the United States of America (the "Government") by knowingly submitting fraudulent reimbursement claims to Medicare. 42 U.S.C. § 1395 *et seq.*  Defendants defrauded Medicare by submitting bills with Current Procedural Terminology codes not adequately supported by medical necessity, by requesting and receiving reimbursement for physicians' services that were not performed by Medicare credentialed physicians, by requesting and receiving reimbursement for surgeries performed by unlicensed lay persons, and by frequently violating national standards of care and medical necessity in order to receive Medicare reimbursements at inflated frequency and monetary value.

4.    Relator was hired by the Defendants as WVI's medical billing coordinator in December of 2009.  In this position, Relator had personal and appropriate access to all of the Defendants' patient charts, billing records, and billing compliance documents. Through her employment as the billing coordinator, Relator obtained first-hand knowledge of the Defendants' fraudulent practices and continuous violations of Medicare regulations.

1

5. Relator witnessed Defendant Wang and Defendant WVI and its agents routinely violating Medicare regulations and falsely billing Medicare in the following categories:

(a) ordering non-physicians to perform and bill surgeries on Medicare patients as if such surgeries were performed by physicians;

(b) ordering physicians who were not credentialed by Medicare to perform services on Medicare patients and billing those services under Defendant Wang's name and Medicare certified number;

(c) violating Evaluation and Management billing requirements both in the actual performance of these services and through improper documentation;

(d) upcoding bills to increase the reimbursement value;

(e) violating standards of medical necessity by treating patients according to a preset protocol rather than treating and billing for what is medically necessary as is required for proper billing; and

(f) violating medical necessity requirements for documentation and billing.

## II.    JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732.

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) & (c), and 31 U.S.C. § 3732(a), as the Defendants' principal place of business is located within this District. Additionally, venue is proper because acts proscribed by 31 U.S.C. § 3729, which are complained of herein, occurred within this District.

## III.    THE PARTIES

8. The Plaintiff is the United States of America, which administers the Medicare program.

2

9.     Relator-Plaintiff Christina LaValley ("Relator") is an adult citizen and resident of the State of Tennessee. Relator has an educational background in biology and emergency medical training. Relator has worked in the medical field for over ten (10) years, and has worked in the medical billing field for eight (8) years. During her eight-year tenure working in the medical billing field, Relator worked in various medical practices and medical companies, where she specialized in accounting, billing, and regulatory compliance. In this regard, Relator is well-versed in the billing requirements of both private payors and government payors, such as Medicare. Relator brings this action based on her direct, independent, and personal knowledge, obtained during the course of her employment with Defendants. Relator discovered the Defendants' fraudulent behavior on or around late 2009 and early 2010 during the course of her everyday work responsibilities as the Defendants' medical billing coordinator. Relator noticed that they continued throughout her employment for the rest of 2010 and her tenure in 2011. On or around the end of July 2011, Relator found another job and voluntarily left her position as billing coordinator at Defendant WVI.

10.    Defendant Wang Vision Institute, PLLC ("Defendant WVI") is a professional limited liability corporation that provides eye care services such as cataract surgery and LASIK surgery. The Defendant's principal place of business is 1801 West End Avenue, Suite 1150, Nashville, Tennessee 37203.

11.    The Defendant Ming Wang ("Defendant Wang") is an individual adult resident of the State of Tennessee and is believed to reside at 2375 Highway 49 East, Pleasant View, Tennessee 37146. Defendant Wang is the primary doctor and surgeon at

3

Defendant WVI, its founder, and conducts business at Defendant WVI's principal place of business. Defendant Wang is a Doctor of Medicine specializing in eye surgery.

## IV. THE FALSE CLAIMS ACT

12. The FCA provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim, to the Government is liable for a civil penalty of between $5,500 and $11,000 per claim plus three times the amount of damages the Government sustained. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

13. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b). "[N]o proof of specific intent to defraud" is required for a successful claim under the FCA. *Id.*

## V. MEDICARE

### A. Overview

14. Title XVIII of the Social Security Act establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program. The Social Security Act is codified in 42 U.S.C. §§ 1395 *et seq.*

15. The Medicare program is a federally operated and funded program. It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS") [formerly the Health Care Financing Administration ("HCFA")], a department of HHS. CMS further delegates the

4

administration of Medicare to private contractors, called Medicare Administrative

Coordinators ("MACs"). 42 U.S.C. §§ 1395h, 1395u.

16.     In this Complaint, for all allegations starting in 2009 and after, Cahaba

GBA ("Cahaba") served as the MAC for the State of Tennessee. Defendant was required

to submit claims for payment of provider services to Cahaba as the Medicare carrier.

Cahaba would then request payment from the United States Government on behalf of the

Defendant.

17.     The Medicare program is comprised of four parts, but only Part B is

involved in this action. Part B is a federally subsidized, voluntary insurance program that

covers a percentage (typically eighty percent) of the fee schedule amount of physician

and laboratory services. 42 U.S.C. §§ 1395k, 1395l, 1395x(s).

### B. *Physicians Services*

18.     In order to be able to provide, and receive reimbursement for, Medicare

services, the "provider or supplier" of Medicare services "must be enrolled in the

Medicare program." 42 C.F.R. § 424.505.

19.     A "supplier" is defined as "a physician or other practitioner, a facility, or

other entity (other than a provider of services) that furnishes items or services" under the

Medicare program. 42 U.S.C. § 1395x(d).

20.     The Social Security Act defines a "physician, when used in connection

with the performance of any function or action," as "(1) a doctor of medicine or

osteopathy legally authorized to practice medicine and surgery by the State in which he

performs such function or action. . . ." 42 U.S.C. § 1395x(r); CTRS. FOR MEDICARE &

5

MEDICAID SERVS., MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT, ch. 5, § 70 (58th rev. ed. 2009), https://www.cms.gov/manuals/ downloads/ge101c05.pdf.

21.     Medicare also considers a doctor of optometry "a physician with respect to all services the optometrist is authorized to perform under State law or regulation." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT, ch. 5, § 70.5(B) (58th rev. ed. 2009), https://www.cms.gov/manuals/ downloads/ge101c05.pdf.

22.     Medicare defers to each state for further clarification on who qualifies as a physician as "[t]he issuance by a State of a license to practice medicine constitutes legal authorization." *Id.* And if "State licensing law limits the scope of practice of a particular type of medical practitioner, only the services within the [State] limitations are covered." *Id.*

23.     Services billed to Medicare by physicians "must be medically reasonable and necessary for the diagnosis or treatment of illness or injury, and must meet all applicable coverage requirements." *Id.*

24.     When a physician enrolls to become a Medicare supplier, the physician "receives billing privileges and is issued a valid billing number effective for the date a claim was submitted for an item that was furnished or a service that was rendered." 42 C.F.R. § 424.505.

25.     Physicians may bill Medicare for, among other things, reimbursement of "physician services."

26.     "Physician services" are defined as "the professional services performed by a physician or physicians for a patient including diagnosis, therapy, surgery,

consultation, and care plan oversight." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE BENEFIT POLICY MANUAL, ch. 15, § 30(A) (151th rev. ed. 2011), https://www.cms.gov/manuals/Downloads/bp102c15.pdf [hereinafter MBPM 15].

27.    Medicare requires that "[t]he physician must render the service for the service to be covered." *Id.* Thus, "[t]o bill under a physician's billing number, either the physician himself must perform the services, or a non-physician must perform services 'incident to' the physician's services." *United States v. Allen*, 116 F. App'x 210, 217 (10th Cir. 2004); MBPM 15, *supra*, at § 30(A) ("A service may be considered to be a physician's service where the physician either examines the patient in person or is able to visualize some aspect of the patient's condition without the interposition of a third person's judgment.").

### *C. Medical Necessity*

28.    Medicare determines reimbursement for a provider's services on the medical necessity and reasonableness of each individual service.

29.    The Social Security Act describes medical necessity in terms of the reasonableness and necessity of a particular service performed for a patient.

30.    The Social Security Act establishes that medical necessity is present when an item or service is "*reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added); *see also* DEP'T OF HEALTH AND HUMAN SERVS. HEALTH CARE FIN. ADMIN., HCFA Ruling 97-1 (Feb. 10, 1997) (resolving a question of "medical necessity, as described in section 1862(a)(1)(A) [now codified at 42 U.S.C. § 1395y(a)(1)(A)] of the Act").

7

31.     Medicare will not reimburse a service provider for an item or service that is not reasonable and necessary.  42 U.S.C. § 1395y(a)(1)(A).

32.     In the case of physician services, Medicare ensures that a service is reasonable and necessary to a patient's treatment by requiring a "Prior Determination of Medical Necessity for Physicians' Services."  42 C.F.R. § 410.20.

33.     A prior determination of medical necessity for physicians' services "means an individual decision by a Medicare contractor [such as a Medicare credentialed physician], before a physician's service is furnished, as to whether or not the physician's service is covered consistent with the requirements of section 1862(a)(1)(A) of the Act relating to medical necessity." *Id.*  In other words, medical necessity (*i.e.*, reasonable and necessary) is critical for properly billing, and receiving reimbursement from, Medicare. 42 C.F.R. § 411.15(k)(1).

34.     A prior determination of medical necessity must be made at each patient visit, and it must be based off of the patient's reasons for seeking treatment at each visit (*i.e.*, the patient's chief complaint).  If providing services to repeat patients, the services provided must be based upon the patient's current medical status at each visit.

35.     These prerequisites for Medicare reimbursement mean that a service provider can only be reimbursed for services where there is adequate documentation for the need and reasonableness of a particular diagnosis, service, test, or surgery. *E.g., In re Lad E. Rubaum, M.D.*, Docket No. M-11-52 (H.H.S. Dept. App. Bd., Medicare App. Council, June 21, 2011) ("When, the documentation does not meet the criteria for the service rendered or the documentation does not establish the medical necessity for the services, such services will be denied as not reasonable and necessary.").

8

36. Medicare has specific rules for diagnostic testing. First and foremost, in order for a diagnostic test to be medically necessary it must be reasonable and necessary for the treatment of the patient's ailment. 42 U.S.C. § 1395y(a)(1)(A).

37. In addition, the test "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem," and the test must be performed under the level of physician supervision appropriate for each particular diagnostic test ordered. 42 C.F.R. § 410.32.

38. While the ordering physician does not always have to sign the diagnostic order, the physician must always "clearly document, in the medical record, his or her intent that the test be performed." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE BENEFIT POLICY MANUAL, ch. 15, § 80.6.1 (151 rev. ed. 2011), https://www.cms.gov/transmittals/downloads/R94BP.pdf. The physician's intent to perform a test must be based upon a prior determination of medical necessity.

39. It is the ordering physician's duty to "maintain documentation of medical necessity in the beneficiary's medical record." *Id.* In addition to the required documentation and diagnosis supporting the physician's intent to order the test, the patient's file must include: (1) a copy of the physician's order of the diagnostic exam, (2) documentation showing that the test was actually performed, and (3) documentation that the physician interpreted the test results.

40. Medicare also requires participating service providers to maintain records of medical necessity as a condition of plan participation. The Social Security Act mandates that:

9

It shall be the obligation of any health care practitioner and any other person . . . who provides health care services for which payment may be made (in whole or in part) under this chapter, to assure . . . that services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this chapter: (1) will be provided economically and only when, and to the extent, *medically necessary*; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by *evidence of medical necessity and quality* in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities.

42 U.S.C. § 1320c-5(a) (emphasis added).

### D. *Coverage Determinations*

41.     Billing Medicare for medically unnecessary treatment is illegal, fraudulent, and violates a condition of payment by the participant. 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 411.15 (delineating "[p]articular services excluded from coverage"); *id.* at § 411.1(b)(1) (stating that "[t]his subpart identifies: (1) The particular types of services that are excluded" from coverage); *see also* 42 C.F.R. § 411 (titled "Exclusions From Medicare and Limitations on Medicare Payment").

42.     In addition to the medically necessary requirement, only those services specifically covered by Medicare may be submitted for reimbursement. The Secretary of HHS, by and through CMS, "promulgate[s] regulations and makes initial determinations to [Medicare] benefits," which includes determining what types of services are covered by Medicare. 42 U.S.C. § 1395ff(a)(1). In addition to regulations, CMS establishes policy manuals and coverage determinations that must be followed by Medicare service providers, such as physicians.

43.     As "Medicare coverage is limited to items and services that are reasonable and necessary," CMS issues National Coverage Determinations ("NCD") that "describe

10

the circumstances for which Medicare will cover specific services, procedures, or technologies on a national basis." *Medical Review and Education Overview*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Medical-Review/ (last visited Jan. 31, 2012).

44. A NCD defines "whether or not a particular item or service is covered nationally" by Medicare. § 1395ff(f)(1)(B).

45. CMS relies on its private contractors (the MACs) to ensure equal compliance with NCDs in local markets. If a NCD does not "specifically exclude/limit an indication or circumstance, or if the item or service is not mentioned at all in the [national coverage determination] or in a Medicare manual", the MAC must make coverage determinations. *Medical Review and Education Overview*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Medical-Review/ (last visited Jan. 31, 2012).

46. Local Coverage Determinations ("LCD") are defined as a determination by a Part B carrier "respecting whether or not a particular item or service is covered. . . ." 42 § 1395ff(f)(2)(B). Additionally, MACs use the LCDs to make determinations concerning provider service functions and "determining the amount of payments" a physician may receive for services rendered to a Medicare patient. 42 U.S.C. §§ 1395u, 1395kk-1(a)(4).

47. Not only do these national and local coverage determinations define what services are covered by Medicare, they also set forth standards that must be met by the service provider in order to prove that a provided service was medically necessary for the treatment of a particular patient.

11

### E. *Evaluation and Management Services Coding versus General Ophthalmology Services Coding*

48.     To facilitate easy billing, CMS has adopted the American Medical Association's five-digit coding system known as Current Procedural Terminology numeric codes ("CPT codes"). CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 30 (2011), https://www.cms.gov/manuals/downloads/clm104c12.pdf. Each CPT code comes with a description of services identifying its proper usage, and the Medicare Physician Fee Services Schedule establishes a usual, customary and reasonable fee for each service rendered, as described by its corresponding CPT code.

49.     As discussed *supra*, physicians must make a prior determination of medical necessity before performing or providing a service on a patient. When selecting CPT codes and submitting claims, "[m]edical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 30.6.1 (2011), https://www.cms.gov/manuals/downloads/clm104c12.pdf. A physician must "select the code for the service based upon the content of the service"; as such a physician may not provide extraneous services to justify a higher CPT code. *Id.* Each listed CPT code and the accompanying documentation submitted with each reimbursement claim must justify that both the level of care provided was medically necessary and that the claimed services were actually performed. Moreover, "it is the provider's responsibility to ensure that the submitted claim accurately reflects the services provided." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE LEARNING NETWORK, EVALUATION AND MANAGEMENT SERVICES GUIDE 8 (Dec. 2010).

12

50.     Failure to use the proper CPT code constitutes a violation of the FCA. *Id.*

Moreover, submitting a bill to Medicare without the proper supporting documentation

(*i.e.* failing to provide documentation to meet the burden of proving medical necessity)

constitutes a violation of the FCA as the provider is billing for an unjustified service. *Id.*

("The provider must ensure that medical record documentation supports the level of

service reported to the payer."); *e.g., In re Lad E. Rubaum, M.D.*, Docket No. M-11-52

(H.H.S. Dept. App. Bd., Medicare App. Council, June 21, 2011) ("When, the

documentation does not meet the criteria for the service rendered or the documentation

does not establish the medical necessity for the services, such services will be denied as

not reasonable and necessary."). Evaluation and Management ("E/M") services are

among the services that Part B covers. E/M services are broken into two groups: those

performed on new patients, and those performed on established patients. New patients

are those who are new to the physician or practice group within the past three years. By

contrast, "[a]n established patient is an individual who has received professional services

from the physician . . . or another physician of the same specialty who belongs to the same

group practice within the previous three years." CTRS. FOR MEDICARE & MEDICAID SERVS.,

MEDICARE LEARNING NETWORK, EVALUATION AND MANAGEMENT SERVICES GUIDE 8

(Dec. 2010).

51.     In each group, the appropriate E/M evaluation (and corresponding CPT

code) depends upon the "nature and amount of physician work." CTRS. FOR MEDICARE &

MEDICAID SERVS, 1997 DOCUMENTATION GUIDELINES FOR EVALUATION AND

MANAGEMENT SERVICES 5 (1997), https://www.cms.gov/MLNEdWebGuide

/25_EMDOC.asp (follow link to PDF).

13

52.     For each of the two categories, there are several levels of E/M evaluations, each with an individual CPT code reflecting the increasing amount of medical attention needed and diagnostic difficulty. *Documentation Guidelines for Evaluation and Management Services*, CAHABA GBA, https://www.cahabagba.com/part_b/ education_and_outreach/educational_materials/Document_Eval_Manage_Services.pdf.

53.     The CPT codes for new patients range from 99201 through 99205, and the CPT codes for existing patients range from 99211 through 99215. The numerical increase in each CPT code reflects the corresponding increase in medical difficulty presented by the patient. Reimbursement rates increase accordingly for each code, resulting in codes ending in "5" receiving the highest rate of reimbursement.

54.     There are three key components that weigh in determining the level of E/M service provided: (1) the complexity of the patient history, (2) the complexity of the patient examination (otherwise known as the presenting problem, or the cause for the patient's visit), and (3) the complexity of medical decision making the physician must undertake to treat the patient. CTRS. FOR MEDICARE & MEDICAID SERVS., 1997 DOCUMENTATION GUIDELINES FOR EVALUATION AND MANAGEMENT SERVICES 5 (1997), https://www.cms.gov/MLNEdWebGuide/25_ EMDOC.asp (follow link to PDF).

55.     The CMS 1997 E/M Guidelines, *supra*, lay out the various combinations of key elements, and the complexity of the key elements, that justify each level of E/M Service.

56.     CMS also requires that the E/M documentation requirements be obtained in a particular manner. As E/M services depend primarily on the amount and complexity

14

of the physician service provided to the patient, there are limited situations in which full or partial E/M Services may be conducted by non-physicians.

57.     For example, a patient history includes some or all of the following elements: the Chief Complaint ("CC"), the History of Present Illness ("HPI"), the Review of Systems ("ROS"), and the Past, Family, and/or Social History ("PFSH"). The CMS 1997 E/M Guidelines provide that the ROS and PFSH "may be recorded by ancillary staff or on a form completed by the patient." *Id.* at 6. The HPI, however, may not under any circumstance be obtained or recorded by anyone other than the physician providing, and billing for, the services.

58.     Additionally, Medicare will pay for E/M services provided by specific non-physician practitioners[1] (nurse practitioners, clinical nurse specialists, and certified nurse midwives) whose specific Medicare benefits permit them to bill these services. CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 30.6.1 (2011), https://www.cms.gov/manuals/downloads/ clm104c12.pdf. Importantly, for a non-physician practitioner to perform E/M services in whole or in part, such performance must be "within the scope of practice for a non-physician practitioner in the State in which he/she practices." *Id.*

---

[1] Cahaba GBA, the MAC for Tennessee, defines non-physician practitioner as follows:

A health care provider who meets state licensing obligations to provide specific medical services. Medicare payments may be made for qualifying services of many non-physician practitioners. Some of these practitioners include: - Audiologist - Certified Registered Nurse Practitioners - Certified Registered Nurse Anesthetists (CNRA) - Certified Nurse Midwives (CNM) - Licensed Clinical Social Workers (LCSW) - Physical and Occupational Therapists - Physician Assistant (PA) - Registered Dietician/Nutrition Professional.

*Glossary*, CAHABA GBA, June 12, 2007, https://www.cahabagba.com/glossary/ definitions/content12n15.htm.

Case 3:12-cv-00317   Document 1   Filed 03/29/12   Page 20 of 76 PageID #: 20

59.     In addition to E/M Codes, physicians may also bill their services using general ophthalmology service codes, commonly referred to as Eye Codes.  E/M Codes and Eye Codes each have different and specific documentation requirements that correspond with medical necessity determinations and the level of physician service provided to the patient.

60.     E/M Codes and Eye Codes are not interchangeable.  The primary difference between E/M Codes and Eye Codes is that the former are used when the physician is evaluating a more systemic disease process that might affect various bodily systems, whereas the latter are used when the physician is focusing primarily on evaluating the function of the eye.

61.     Ophthalmologists and optometrists must make a case-by-case determination of whether an E/M Code or an Eye Code is appropriate for a particular patient.  *See* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE LEARNING NETWORK, EVALUATION AND MANAGEMENT SERVICES GUIDE 4-5 (Dec. 2010) (explaining the relationship between choosing the correct E/M Code and medical necessity requirements, meaning that the "service must be furnished for the diagnosis, direct care, and treatment of the beneficiary's medical condition").

62.     Billing a physician service with an E/M Code where only an Eye Code is appropriate violates Medicare's medical necessity and documentation requirements.  In situations in which the E/M Code renders a higher reimbursement rate than the Eye Code, intentionally choosing the E/M code in order to receive the higher reimbursement rate constitutes upcoding, and is a fraudulent billing practice.  *See* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE LEARNING NETWORK, EVALUATION AND MANAGEMENT

16

SERVICES GUIDE 4 (Dec. 2010) ("When billing for a patient's visit, select codes that best represent the services furnished during the visit. . . . It is the provider's responsibility to ensure that the submitted claim accurately reflects the services provided").

For example, the 2012 Physician Fee Schedule issued by Cahaba shows that the most a provider can be reimbursed for billing Ophthalmology CPT Code 92004 is $147.15. The most a provider can be reimbursed for billing E/M Code 99204 is $163.62. *Cahaba GBA Medicare Part B Fee Schedule Allowances*, CAHABA GBA (Nov. 18, 2011), https://www.cahabagba.com/ part_b/claims/fee_schedule_allowances.htm

63.     E/M Code 99204 is properly used when the physician sees a new patient, the physician performs a comprehensive patient history and examination, the diagnosis requires a moderate level of decision making complexity, the patient's presenting problem is of moderate to high severity, and the physician usually spends forty-five (45) minutes of face-to-face time with the patient. *CPT/HCPCS Codes Included in Range 99201-99205*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/ medicare-coverage-database/staticpages/cpt-hcpcs-code range.aspx?DocType= LCD&DocID=32007&ver=2&Group=1&RangeStart=99201&RangeEnd=99205 (last visited Mar. 7, 2012).

64.     By contrast, Eye Code 92004 is appropriately used where the physician is visiting a new patient, the physician's main task is diagnosing the eye, the medical examination, evaluation and initiation of diagnostic and treatment plan is at an intermediate level. CMS MANUAL SYSTEM, PUB. 100-04 MEDICARE CLAIMS PROCESSING, TRANSMITTAL 801 (Dec. 30, 2005).

17

65.     A physician's use of E/M Code 99204 when only Eye Code 92004 is appropriate overcharges Medicare and violates medical necessity requirements for billing E/M codes.

### F. *Regulatory Requirements for Eye Surgery*

#### 1. *General Requirements*

66.     Medicare relies on State licensing to determine who qualifies as a physician, and in turn, who may perform surgery.  42 U.S.C. § 1395x(r) ("A physician, when used in connection with the performance of any function or action, means (1) a doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he performs such function or action. . . .").

67.     The State of Tennessee defines the practice of medicine broadly, constituting that "[a]ny person shall be regarded as practicing medicine, within the meaning of this chapter, who treats, or professes to diagnose, treat, operates on or prescribes for any physical ailment or any physical injury to or deformity of another." TENN. CODE. ANN. § 63-2-204(a)(1).

68.     Tennessee mandates that "[n]o person shall practice medicine in any of its departments within this state unless and until such person has obtained a license" from the state board of medical examiners.  TENN. CODE. ANN. § 63-2-201(a).

69.     The Rules of the Tennessee Board of Medical Examiners hold that "a license to practice medicine issued pursuant to TENN. CODE. ANN. § 63-4-204 authorizes the holder to perform surgery."  TENN. COMP. R. & REGS. 0880-02-.21 (establishing the rules for office based surgery).

70.     The Rules of the Tennessee Board of Medical Examiners define surgery as:

The excision or resection, partial or complete, destruction, incision or other structural alteration of human tissue by any means (including through the use of lasers) performed upon the body of a living human for purposes of preserving health, diagnosing or curing disease, repairing injury, correcting deformity or defects, prolonging life, relieving suffering, or for aesthetic, reconstructive or cosmetic purposes, to include, but not limited to: incision or curettage of tissue or an organ; suture or other repair of tissue or organ, including a closed or an open reduction of a fracture; extraction of tissue, including premature extraction of products of conception from the uterus; and insertion of natural or artificial implants. For the purpose of this rule, certain diagnostic and therapeutic procedures requiring medication to immobilize the patient are contained within the definition of surgery.

TENN. COMP. R. & REGS. 0880-02-.21(o).

### 2. Global Surgery Packages

71.     Medicare instituted the Global Surgery Package program in 1992.

72.     Every surgical procedure is placed into one of two categories for billing purposes: major surgeries and minor surgeries. Major surgeries have a global surgery period of ninety (90) days. Minor surgeries have a global surgery period of between zero and ten (0-10) days. *See* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 40.1(E) (2011), https://www.cms.gov /manuals/downloads/clm104c12.pdf.

73.     The duration of the global period for a major surgery is calculated by counting one (1) "day immediately before the day of surgery, the day of surgery," and then the "appropriate number of days immediately following the day of surgery." *Id.*

74.     The global surgery package lumps together certain services performed directly related to a surgery. *Id.*; *id.* at § 40.4(A) ("[T]he Medicare fee schedule amount for surgical procedures includes all services that are part of the global surgery package . .

19

. .."). This way a physician only charges Medicare for the surgery instead of each individual service related to the surgery. *Id.*

75.     Medicare provides specific examples of categories of services that are both included and excluded from a global surgery package. *Id.* at § 40.1(A)-(B).

76.     Those examples of the types of services included in the global surgery period are: preoperative visits, intra-operative services, "all additional medical or surgical services required of the surgeon during the postoperative period of the surgery because of complications which do not requires additional trips to the operating room," postoperative visits, postsurgical pain management, supplies, and miscellaneous services. *Id.*

77.     In addition to those items listed above, minor surgeries carry additional categories of services included in the global surgery package. A minor surgery's global package includes the cost of the initial evaluation of the problem by the surgeon to determine the need for surgery. *Id.* at § 40.1(A)-(B); *id.* at 40.2(A)(4) ("Moreover, where the decision to perform the minor procedure is typically done immediately before the service, it is considered a routine preoperative service and a visit or consultation is not billed in addition to the procedure."). Additionally, "[v]isits by the same physician on the same day as a minor surgery . . . are included in the payment for the procedure . . . ." *Id.* at § 40.1(C).

78.     The only way for a physician to separately charge for a visit performed on the same day as a minor surgery is if a "significant, separately identifiable service" is performed. *Id.* at § 40.1(B). Moreover, the "significant, separately identifiable service"

20

that causes the visit must be "unrelated to the diagnosis for which the surgical procedure is performed." *Id.*

79.     When a physician finds it medically necessary to perform a "significant, separately identifiable service" that is "unrelated to the diagnosis for which the surgical procedure is performed," Medicare requires the use of certain coding modifiers. *Id.*

80.     When the "significant, separately identifiable service" is an E/M service performed on the same day as a surgery, modifier "-25" must be added to the E/M CPT code. *Id.* at § 40.2(A)(8). Use of the -25 modifier instructs Medicare that "the patient's condition required a significant, separately identifiable evaluation and management service above and beyond the usual preoperative and postoperative case associated with the procedure or service that was performed." *Id.* As with any physician service, "[b]oth the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician . . . in the patient's medical record to support the claim for these services. . . ." *Id.* at § 30.6.6(B).

81.     Different modifiers are used when billing unrelated procedures or visits during the postoperative period. Modifier "-79" is used to "report an unrelated [surgical] procedure by the same physician during a postoperative period." *Id.* at § 40.2(A)(7). When an E/M service "absolutely unrelated to the surgery" is performed by "the same physician during a postoperative period" the physician must append modifier "-24" to the CPT code relating to the appropriate level of E/M service. *Id.* Just as with modifier -25, medical necessity based on the patient's condition must support the use of modifiers -79 and -24.

        3. *Lacrimal Punctal Occlusion with Punctal Plugs*

21

82.     Dry Eye Syndrome ("DES") is one of the most common eye complaints in the United States.  DES negatively affects tear production and the ocular surface of the eye resulting in a wide range of symptoms such as: redness, itchiness, grittiness, stinging, burning, dryness, excessive tearing, blurred vision, increased blinking, mucous discharge and general discomfort.  *See* Leslie Burling-Phillips, *Clinical Update Cornea: Dry Eye Gets Some Respect*, American Academy of Ophthalmology (2009), http://www.aao.org/aao/publications/eyenet/200707/cornea.cfm.

83.     Lacrimal Punctal Occlusion ("LPO") is a surgical remedy for DES.  As LPO is a surgical procedure, only a state licensed physician is allowed to perform the procedure. TENN. CODE. ANN. § 63-2-201(a); TENN. COMP. R. & REGS. 0880-02-.21.

84.     LPO with punctal plugs is one of the most common minor procedures in the optometry field.  In 2007, LPO with punctal plugs was performed by ophthalmologists and optometrists about 1 time per 100 eye exams.

85.     As Medicare requires physicians to pursue non-surgical methods to treat a non-emergency disease prior to authorizing surgery, LPO through punctal plugs should not be the initial treatment for DES.

86.     For an LPO to be medically necessary (and therefore be eligible for proper reimbursement ), several steps must be documented in the patient's chart to justify surgery:

> a.  The patient's chart demonstrates a clear patient complaint of DES, a history of DES, and a recorded diagnosis of DES;
> b.  Documentation of the various diagnostic tests and examinations used to diagnose and determine the severity level of the patient's DES.  The severity of the disease is key in determining the appropriateness of a therapeutic regime.  Usually two or more diagnostic tests are performed to support a diagnosis of DES (the usual tests include: Schirmers Test, Tear

22

Break-Up Time, Slit Lamp exam with Rose Bengal, Tear Assay, or Zone-Quick);

c.  A demonstration that the patient has undergone two (2) to four (4) weeks of conventional treatment using eye drops and ointments, and clear documentation of the effectiveness of these treatments; and

d.  If the non-surgical treatment regimes do not work, then surgical options may be discussed. The patient's chart should include clear documentation that the physician reviewed the risks and benefits of the procedure with the patient. The chart must reflect confirmation of the patient's informed consent to perform the surgical procedure.

87.     LPO treats DES by blocking one or more lacrimal punctum (otherwise known as a tear duct) in a temporary, semi-permanent, or permanent fashion. Physicians obtain temporary and semi-permanent punctal closures through the use of collagen and silicon punctal plugs respectively.

88.     Medicare considers use of punctal plugs to be a transitional therapy, as permanent closures of the tear ducts and alternative therapies for DES are available. As such, physicians should first use temporary collagen plugs to test the patient's reaction and treatment efficacy before using semi-permanent silicon plugs. Medicare does give deference to the physician's choice between temporary or semi-permanent plugs; however, a physician must not use temporary plugs where semi-permanent plugs (or permanent surgical lacrimal closure) are medically necessary. At least one MAC has stated in its LCD on punctal plugs that "[t]he repeat use of temporary (collagen) plugs for ongoing therapy for dry eye syndrome has no proven value." *See Clinical Policy Bulletin No. 0457: Dry Eyes*, AETNA (Mar. 25, 2011), http://www.aetna.com/healthcare-professionals/policies-guidelines/cpb_alpha.html.

89.     Medicare considers punctal plug insertion a minor surgical procedure with a ten (10) day global surgery period. The global surgery package includes the office visit and the insertion of the plug. None of these aspects are separately billable. Only those

23

"significant, separately identifiable services" stemming from a separate diagnosis may be billed separately if performed on the same day as an LPO operation, and then only if properly documented with a -25 modifier. *See* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 40.2(A)(8) (describing the proper use of modifier -25 when used in conjunction with a minor surgery).

90.     The determination that LPO is medically necessary and the insertion of the punctal plugs usually occurs during the same office visit. If DES is the only symptom documented by the patient as the chief complaint and DES is the only symptom treated by inserting punctal plugs, the physician should not bill for a separate office exam, since all related services within the 10-day period are already covered by Medicare in the global package.

### *4. Cataract Surgery*

91.     A cataract is a clouding of the eye's lens causing loss of vision acuity. It frequently occurs in persons over the age of sixty-five, and cataract surgery with the insertion of an intraocular lens is a "high volume Medicare Procedure." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE NATIONAL COVERAGE DETERMINATION MANUAL, ch. 1, part 1, § 10.1(A) (129 rev. ed. 2010), https://www.cms.gov/Manuals/iom/ItemDetail.asp? ItemID=CMS01496.

92.     During cataract surgery, the surgeon removes the eye's natural lens and replaces it with an artificial one. The artificial lens is called the intraocular lens ("IOL"). There are two types of intraocular lenses. The first is the standard lens that does not fix any vision errors (refractive errors), which Medicare pays for in full. CTRS. FOR

MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL, ch. 32, § 120 (801 Rev. ed. 2005). The second type of lens is a presbyopia-correcting lens (often referred to as a premium IOL) that can reflect vision errors (near sidedness, far sidedness, astigmatism). *Id.* CMS recently updated its policies to allow surgeons to implant premium lenses in Medicare patients; however the patient must pay the cost difference between the standard IOL and the premium IOL. *Id.*

93. Due to the high frequency of cataract surgeries billed to Medicare, CMS and the MACs have issued extensive guidance on proper performance, documentation, and billing of cataract surgery and related procedures.

94. Where cataracts are a patient's only diagnosis, Medicare "does not routinely cover testing other than one comprehensive eye examination . . . and an [ultrasound] A-scan . . . . Claims for additional tests are denied as not reasonable and necessary unless there is an additional diagnosis and the medical need for the additional tests is fully documented." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE NATIONAL COVERAGE DETERMINATION MANUAL, ch. 1, part 1, § 10.1(A) (129 rev. ed. 2010), https://www.cms.gov/Manuals/iom/ItemDetail.asp? ItemID=CMS01496.

95. Medicare will only pay for a second pre-surgery cataract evaluation when a second evaluation is medically necessary and is supported by the required documentation.

96. Cahaba GBA, the MAC in Tennessee, issued a cataract LCD specifically outlining medical necessity and other requirements that must be met in order for Medicare to cover the procedure. *Local Coverage Determination L30058: Cataract*

*Extraction*, CAHABA GBA (Mar. 2010), http://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=30058&ver=16&ContrId=218&ContrVer=1.

97.   The physician must provide appropriate documentation that:

   a.   "The primary indication for surgery is visual function that no longer meets the patient's needs and for which cataract surgery provides a reasonable likelihood of improvement";

   b.   "Cataract removal is also indicated when the lens opacity inhibits optimal management of posterior segment disease or the lens causes inflammation, angle closure, or medically unmanageable open-angle glaucoma";

   c.   "The patient has been educated about the risks and benefits of cataract surgery and alternatives to surgery and has provided informed consent";

   d.   "The patient has undergone an appropriate preoperative ophthalmologic evaluation, which generally includes a comprehensive ophthalmologic exam (slit lamp, dilated ophthalmoscopy, intraocular pressure) and ophthalmic biometry. Other ophthalmologic studies should be reserved for special situations"; and

   e.   "The patient's history must include the patient's own assessment of his/her functional status."

*Id.*

98.   Cataract surgery is an elective surgery, CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE NATIONAL COVERAGE DETERMINATION MANUAL, ch. 1, part 1, § 10.1(A) (129 rev. ed. 2010), and is a major surgery carrying a ninety (90) day global surgery period. Cataract surgery is a unilateral procedure that requires a wholly distinct and independent determination of medical necessity supporting the need for surgery in each eye. If a patient presents with cataracts in both eyes, it is standard procedure to treat the patient's dominant eye first.

99.   With respect to surgery on both eyes, if and only if the cataract surgery on the first eye does not correct the patient's vision to the level needed, then can the decision be made to perform surgery on the second eye. As always, the medical necessity to perform surgery on the second eye must be properly documented in the patient's chart.

26

### *5. Yttrium Aluminum Garnet ("YAG") Capsulotomy Procedure*

100.    After cataract surgery, some patients develop a clouding over the new artificial lens that was inserted during the cataract surgery. This clouding can develop anywhere between several months to several years after the cataract surgery.

101.    In order to remove this clouding, the patient can undergo a procedure called a YAG Capsulotomy, where a YAG laser is used to break up the cloudy film obscuring the patient's vision.

102.    Cahaba's LCD on this procedure sets out the required indications that must be found and properly documented in a patient's history prior to performing this surgery. *Local Coverage Determination L30604: YAG Capsulotomy*, CAHABA GBA (Mar. 1, 2010), http://www.cms.gov/medicare-coverage-database/details/lcd-.

103.    The YAG procedure normally should not be performed earlier than ninety (90) days after cataract surgery. Medical necessity for a YAG procedure is based upon one or more of the following:

    a.    "Visual loss and/or symptom of glare (visual acuity 20/30 or worse after Snellen conditions, using contrast sensitivity, or simulated glare testing)";
    b.    "Symptoms of decreased contrast";
    c.    "Amount of posterior capsular opacification"; or
    d.    "Other possible causes of decreased vision following cataract surgery."

*Id.*

104.    As with any medical service, a physician must determine on a case-by-case basis whether a YAG procedure is medically necessary. *See* 42 C.F.R. § 410.20 (requiring a determination of medical necessity prior to providing a service). Physicians will be reimbursed for those procedures supported by legitimately prepared documentation.

27

## VI. FACTS COMMON TO ALL COUNTS AND OVERVIEW OF FRAUDULENT ACTIONS BY DEFENDANT WVI AND ITS AGENTS (INCLUDING DEFENDANT WANG)

105.    Relator witnessed Defendant Wang and Defendant WVI and its agents, on a regular basis and as a matter of course, commit the following categories of fraudulent acts in violation of the Federal False Claims Acts and conditions of payment for services under Medicare:

    a.  ordering non-physicians to perform and bill surgeries on Medicare patients as if such surgeries were performed by physicians;

    b.  ordering physicians who were not credentialed by Medicare to perform services on Medicare patients and billing those services under Defendant Wang's name and Medicare certified number;

    c.  violating Evaluation and Management billing requirements both in the actual performance of these services and through improper documentation;

    d.  upcoding bills to increase the reimbursement value;

    e.  violating standards of medical necessity by treating patients according to a preset protocol rather than treating and billing for what is medically necessary as is required for proper billing; and

    f.  violating medical necessity requirements for documentation and billing.

106.    More specifically, Defendant Wang and Defendant WVI:

    a.  Ordered agents to follow a preset protocol of patient treatment designed to increase Medicare reimbursement rates instead of treating patients and billing Medicare according to medical necessity;

    b.  Continuously violated Evaluation and Management requirements by:

        i.  Intentionally and routinely upcoding patient visits with medically unnecessary E/M Codes instead of Eye Codes in order to receive higher reimbursement; and

        ii. Habitually instructing and permitting non-licensed personnel to record patients' History of Present Illness ("HPI") on their charts, instead of properly complying with E/M regulations by having the physician record HPI;

    c.  Ordered various non-Medicare credentialed physicians to provide medical services to Medicare patients, and then illegally billed Medicare for those services under the name and billing number of Medicare credentialed physicians;

28

d. Improperly performed Lacrimal Punctal Occlusion: Violations of Medical Necessity, Surgical Performance, Billing Practices; and

    i. Egregiously violated Medicare regulations and Tennessee law by instructing and permitting Technicians to perform the actual surgery;

    ii. Violated medical necessity by performing surgical treatment first instead of pursuing non-surgical treatments as required by CMS; and

    iii. Fraudulently divided the diagnostic office visit and the punctal plug insertion in order to improperly charge Medicare for multiple office visits; and

e. Violated medical necessity both in the performance of physician services, patient chart documentation, and billing practices:

    i. Performing first and second eye cataract surgery before surgery was medically necessary, and improperly conducting diagnostic tests used to diagnose the need for cataracts in order to fraudulently create documentation of medical necessity;

    ii. Performing YAG Capsulotomy Procedures on nearly every patient who underwent cataract surgery even when a YAG procedure was not medically necessary;

    iii. Performing and billing for every possible diagnostic test and exam supported by a particular diagnosis instead of only performing medically necessary diagnostic tests and exams;

    iv. Charging office visits for treatment of the same ailment under an artificial primary diagnosis in order to receive reimbursement for office visits otherwise prohibited by Medicare guidance or Global Surgery Packages;

    v. Routinely conducting prohibited behavior when dealing with patient chart notation, such as: creating and signing patient charts, post-operative notes, and noting diagnoses on patient charts prior to the physician actually performing the office visit or physician service (*i.e.*, using "canned" charts); retroactively altering patient charts in order to provide a supporting diagnosis and required medical necessity documentation for subsequent office visits, procedures, and surgeries; and instructing physicians to leave chart

29

notations intentionally vague so as to make proactive notations and retroactive alterations more difficult to detect.

## VII. FACTS

### A. *Dr. Wang and the Wang Vision Institute, PLLC*

107.    In 2002, Defendant Ming Wang started his ophthalmology and surgery practice in Nashville, Tennessee. In November 2004, Defendant Wang established his current practice, Defendant WVI.

108.    Defendants WVI and Wang advertise their services as being "state of the art," calling Defendant Wang a "world class surgeon", having "world class technology", providing "world-class care", and being dedicated to humanitarian efforts. *About Us*, WANG VISION INSTITUTE, http://www.wangvisioninstitute.com/about.html. The Defendants' public portrayal is not correct. Instead of focusing on patient wellbeing, Defendants focus only on the financial bottom line, leading them to routinely violate medical necessity standards and sacrifice patient wellbeing in order to make sales. These violations include illegally and fraudulently billing Medicare.

### B. *Relator's Tenure Working at Defendant WVI*

#### 1. *Illegal and Fraudulent Billing Practices and Medicare Violations*

109.    Relator began working for Defendant WVI as its billing coordinator in December 2009. Relator, through her regular work duties and personal experience, first noticed Medicare violations in early 2010, shortly after she started working at Defendant WVI.

110.    The first Medicare violation that Relator found was the Defendants' practice of illegally and fraudulently billing Medicare for services provided by non-Medicare credentialed physicians. Instead of getting each staff physicians credentialed to

treat Medicare patients and bill to Medicare, Defendant Wang instructed the non-Medicare credentialed physicians to conduct the entire patient visit or service and then get another Medicare credentialed physician to sign off on the charts. Defendant Wang then instructed that services performed by non-Medicare credentialed physicians should be billed under his name and billing number. In these cases, Defendant Wang did not personally see these patients, review their charts, or function in any supervisory role, but his billing number and name were illegally and fraudulently used to bill Medicare as if he had done so.

111.    When Relator discussed this practice with Dr. Helen Boerman, a senior-level optometrist known in the office as Defendant Wang's "second in command," Dr. Boerman told Relator that this was a long-standing practice at the office, and that it was perfectly acceptable. When Relator informed Dr. Boerman that the practice was not, in fact, acceptable, Dr. Boerman responded that as long as Defendant Wang wanted to "assume liability" for the charges they could be submitted without him seeing the patient.

112.    In 2010, despite being told by Dr. Boerman that using non-credentialed physicians was legal, Relator continued to meet with Dr. Boerman and then Defendant Wang to ensure that all physicians received proper credentials. Defendant Wang did not allow Relator to start the Medicare credentialing process for the other staff Optometrists until after an outside audit by the Corcoran Consulting Group in or around October 2010. While Defendants made this correction going forward, Defendant VMI did not notify CMS nor correct for its prior illegal billing of Medicare.

113.    The strong pushback Relator received from Defendant Wang and Dr. Boerman concerning the use of non-credentialed physicians raised Relator's suspicions

that Defendants were committing other Medicare violations. Relator's suspicions were confirmed shortly thereafter. Relator found numerous violations of Medicare E/M Guidelines and Medicare medical necessity requirements (violations in diagnosis, surgery, general patient care, maintenance of patient records, and in bills submitted to Medicare), as well as Technicians illegally performing punctal plug surgeries that were then billed to Medicare as if performed by physicians. Relator also found that Defendant WVI performed cataract surgeries, punctal plugs, and YAG Capsulotomy procedures at excessive rates.

114.    In 2010, subsequent to making these findings, through at least one internal memorandum and discussions in routine staff meetings, Relator brought these violations and compliance issues to the attention of Defendant Wang, Defendant WVI, and its agents.

115.    As 2010 progressed, Relator noticed that her efforts to educate Defendant Wang and Defendant WVI and its agents about proper billing procedures, medical necessity, and Medicare compliance issues were largely futile, and that Defendants continued to violate Medicare regulations and guidance and to illegally bill Medicare.

116.    During Relator's tenure at Defendant WVI, Dr. Dora Sztipanovits informed Relator that she was leaving the practice because she feared she would lose her medical license if she stayed, due to Defendant Wang and Defendant WVI illegally billing Medicare and violating medical ethics rules. In fact, Dr. Sztipanovits did leave Defendant WVI in November 2010.[2]

---

[2] Dr. Dora Sztipanovits started working for the Vanderbilt University Medical Center in 2010, and to the best of Relator's knowledge, she is still working there as of the filing of this complaint.

32

117. In the spring of 2010, Relator stepped up her Medicare compliance efforts. Relator requested that a Medicare billing consulting firm come in and speak to Defendant Wang and Defendant WVI's agents.

118. In or around July 2010, Relator drafted an internal memorandum entitled "Coding & Compliance and Medicare Audits" (the "Audit Memorandum") and distributed it to Defendant Wang and all of Defendant WVI's physician and non-physician agents. In drafting this memorandum, Relator aimed to provide clear rules and examples on various billing issues — E/M services and coding, medical necessity and documentation for diagnostic tests, etc . . . — and to highlight that Defendant WVI was an extreme outlier in terms of the frequency of cataract surgery, punctal plugs, and YAG Capsulotomy procedures.

119. Relator hoped that this memorandum would result in the Defendants realizing the importance of complying with Medicare regulations and proper billing policy. It did not. Despite Relator's continuous efforts to educate the Defendants on proper patient care, billing, and compliance techniques, the Defendants did not come into compliance with Medicare. Instead, as shown in more detail below, Defendant Wang, Defendant WVI and its agents continued to knowingly violate Medicare regulations concerning patient care, medical necessity requirements, and billing practices resulting in the Defendants intentionally submitting and receiving reimbursement from Medicare for fraudulent charges.

2. *The Corcoran Consulting Group Audit*

120. In the Autumn of 2010, Defendant Wang finally acquiesced to Relator's requests to meet with a consulting firm to discuss the Defendants' billing and patient care

33

practices. In October 2010, the Defendants met with Corcoran Consulting Group ("Corcoran"). The Defendants held several phone conferences with Corcoran to discuss Defendants' billing and patient care practices, and steps for Defendants to take to comply with Medicare regulations. Corcoran also performed a prospective audit of fifty (50) charts of randomly-selected Medicare patients seen by Defendant Wang and Defendant WVI's agents (collectively referred to as "the Corcoran Audit").

121.    Corcoran issued its audit on or about November 2010. The Corcoran Audit echoed many of the same concerns that Relator had expressed to Defendants since the beginning of the 2010 calendar year. Corcoran found many instances of Medicare noncompliance and billing violations including:

> a)  The improper practice of billing services performed by non-Medicare credentialed physicians under Defendant Wang's name and billing number;
>
> b)  The improper practice of having Medicare credentialed physicians signing off on charts for patients seen only by non-Medicare credentialed physicians;
>
> c)  The continuous practice of having Technicians[3] perform punctal plug surgery;
>
> d)  Patient charts for second-eye cataracts with deficient medical necessity documentation, less than necessary to justify performing or billing the surgery on a second eye;
>
> e)  Improper upcoding of office visits as E/M services and using the higher cost E/M Code instead of the medically necessary lower Eye Code; and
>
> f)  The continuous lack of medical necessity documentation for diagnostic testing, in particular a lack of documentation showing a physician's interpretation of a diagnostic exam.

---

[3] "Technician", as used in this Complaint, is a defined term meaning those staff members working at Defendant WVI who do not possess any medical education, training, certification, and who are not licensed to practice medicine in the state of Tennessee.

122. In light of its findings, Corcoran informed the Defendants that they must immediately come into compliance with all Medicare regulations and guidance. Importantly, Corcoran instructed Defendant WVI to reimburse to Medicare whatever money Medicare had improperly paid out based on WVI's unlawful billing. Additionally, Corcoran suggested that the Defendants contact an attorney to start a voluntary self-disclosure of past violations to Medicare to show CMS that improper billing was being rectified.

### 3. After the Corcoran Audit, Defendants Continued to Intentionally Violate Medicare Regulations and Submit Illegal Bills for Reimbursement

123. Unfortunately, Defendant Wang, Defendant WVI and its agents did not receive the Corcoran audit well. Defendant Wang and Defendant WVI and its agents largely ignored the warning from Corcoran and actually took additional steps to hide Defendant WVI's illegal and fraudulent billing activity in case CMS decided to conduct a Medicare audit.

124. After the Corcoran Audit, in or around November/ December 2010, Defendant Wang began asking Relator to put together a "Compliance File," where he would instruct Relator to place various emails and documents that supposedly demonstrated the Defendants' attempts to comply with Medicare regulations.

125. Soon after Defendant Wang ordered Relator to create the Compliance File, he told Relator that the Compliance File's only purpose was to protect Defendants in case a Medicare audit occurred. If an audit should occur, Defendant Wang told Relator that he would then use this file to "show intent" to Medicare that he was trying to comply with all regulations. Thus, instead of actually complying with Medicare regulations,

35

Defendants continued to knowingly violate these regulations and attempted to lay the groundwork to hinder an audit.

### 4. Audit by Riva Lee Asbelle & Associates

126.    On or around April 2011, Defendants began working with a second consultant, Riva Lee Asbelle & Associates ("Riva Lee"), an ophthalmology reimbursement consulting firm. One of the primary issues Riva Lee addressed was E/M services and required documentation, including whether or not a Technician can record HPI. Riva Lee correctly instructed the Defendants that their past practice of having a Technician fill out the patient HPI was improper and a direct violation of Medicare's E/M Guidelines, and was thus improper billing of Medicare.

127.    Despite this second warning about improperly billing Medicare, the Defendants did not come into full compliance with Medicare regulations and requirements after the Riva Lee consultation. Instead, Defendants continued to have Technicians interview patients about, and write down, the HPI even though Defendants knew that this practice directly violated Medicare's E/M Guidelines.

128.    For instance, on or around April 2011 and thereafter, Defendant WVI began to almost wholly ignore medical necessity requirements for Medicare billing. On or around April 2011, Defendant Wang, through emails and personal instruction in staff meetings, ordered that he and Defendant WVI's other agents should start performing and billing for almost every test covered by Medicare, regardless of medical necessity.

129.    In order to determine which diagnostic tests to perform, Defendant Wang asked Relator to develop a master list of the tests and exams covered by Medicare for any given diagnosis CPT code. While Medicare allows physicians to choose from a variety

36

of tests and exams to help diagnose and treat a particular disease, it does not allow

providers to bill for diagnostic tests simply because a certain diagnosis had been

determined. An independent decision must still be made that a particular test or exam is

medically necessary prior to performing it on a particular patient. As Defendant Wang's

emails demonstrate, Defendant Wang wanted to use this list to perform the maximum

number of tests and ensure the highest possible reimbursement, even though many of

these tests were not supported by medical necessity.

130.    Heading into the Summer of 2011, Relator observed that Defendants'

practice was still not in compliance. The Defendants continued to perform cataract and

YAG surgeries when not medically necessary and without providing the required

documentation, and they still allowed Technicians to perform punctal plug surgery.

Defendants also continued to use false diagnoses in order to fraudulently bill Medicare

for non-billable office visits, and continued to violate E/M regulations by having

Technicians interview patients and record HPI, and more.

131.    As a result of these unlawful practices, Defendants continued to submit

illegal bills to Medicare and to receive illegal reimbursement. Defendants did not self-

report and did not return funds overpaid to them by Medicare.

**C.    Defendant Wang and Defendant WVI Used a Preset Protocol Designed to Increase Medicare Reimbursement Rates Instead of Treating Patients and Billing Medicare According to Medical Necessity.**

132.    Throughout Relator's Tenure at Defendant WVI, she noticed a harmful

pattern in Defendants' methods for treating patients. Instead of particularizing the care

provided, based on individual patient needs, Defendants Wang and WVI and its agents

37

often followed preset treatment protocols that violated medical necessity, maximizing profits by diagnosing patients with symptoms and illnesses even before they were seen.

133. One of the most prevalent examples of preset determination was the frequency with which Defendant Wang, Defendant WVI and its agents diagnosed patients with DES and/or Blepharitis. They then used these diagnoses to get fraudulent reimbursement for products and services, such as additional office visits and surgical punctal plugs.

134. Starting in the spring of 2010, and continuing throughout her tenure at Defendant WVI, Relator noticed that Defendant WVI was diagnosing an overwhelming majority of its patients with DES or Blepharitis, usually as a secondary or tertiary diagnosis. Relator was troubled at the rate with the rate at which different patients were diagnosed with these diseases, as it seemed highly unlikely for so many patients to present with the same diseases. Once a DES or Blepharitis secondary diagnosis was listed, Defendant Wang used this diagnosis as a justification to bill Medicare for future office visits and services that would otherwise not have been reimbursable.

135. For example, Relator often saw patients coming in for a cataract exam listing problems associated with cataracts as a Chief Complaint, with no listings at all for secondary or tertiary complaints. However, the patient's chart would nonetheless show a secondary or tertiary diagnosis of DES or Blepharitis. These diagnoses were made even though the patient never complained of DES or Blepharitis symptoms nor exhibited any DES or Blepharitis symptoms.

136. Defendant Wang, in fact, ordered Relator and all of Defendant WVI's agent physicians that they should "always list" DES and/or Blepharitis as a secondary or

38

tertiary diagnosis on the patient's chart, because the physicians can "always find symptoms to support these diagnoses." Defendant Wang then ordered that these secondary and tertiary diagnoses be used to bill Medicare for office visits that should only be billed as part of a global surgery package and not as separate office visits.

137.    Defendant Wang's Weekly Agenda Emails show how he and Defendant WVI's agents used DES as a marketing ploy designed to bring clients into the office and charge Medicare for additional office visits. For example, an Agenda Email dated July 25, 2011, shows how Defendants used improper DES diagnoses to convince patients to undergo cataract surgery, which the patients did not actually need, and to then bill those office visits and surgeries to Medicare.

138.    In this email, Defendant Wang instructs a WVI staff member to create a spreadsheet of patients who had come in for a cataracts screening but decided not to undergo a cataract surgery procedure. Defendant Wang then instructs Defendant WVI's physicians to contact these patients and "salvage" the business relationship with them by citing various medical reasons why the patient should come back to WVI for another visit — specifically listing DES as one of these reasons.

139.    This last instruction violated medical necessity rules. As Defendant Wang clarified in a meeting, he was not instructing Defendant WVI's agents to treat the patient under a primary diagnosis of DES when the patient returned to WVI for another office visit. Instead, Defendant Wang was instructing those agents to fraudulently "market" DES and other diagnoses so that Defendants could push cataract surgeries on patients, whether they needed such surgeries or not.

39

140.     Additionally, Defendants would charge the office visit to Medicare under a fraudulent diagnosis and CPT Code for DES, which misrepresented the services performed by Defendants in order to ensure reimbursement eligibility.  CPT Codes may only be used to identify the services actually provided, and providing a cataract screening is a distinct service from an office visit to treat DES.  Accordingly, Defendants' actions violated CPT usage rules, and by extension, medical necessity standards.  As demonstrated in the Agenda Emails, Defendant Wang's reference to these second office visits and office meetings as "Cataract New Screen 2" visits shows that billing these visits under DES and other diagnostic codes was improper.  This notation demonstrates how Defendant Wang, Defendant WVI and its agents would use the secondary diagnosis of DES to leverage unsuspecting patients to return to the clinic for another office visit, which Defendants, in turn, would illegally bill to Medicare.

141.     Additionally, Relator noticed that Defendant Wang would frequently modify patient charts by adding a partially, if not completely, manufactured diagnosis of DES to justify later expenses and office visits.

142.     For example, a seventy-year-old patient ("Patient MC") came for a cataract evaluation at Defendant WVI on July 11, 2011.  Patient MC was seen by Dr. Michael George, one of Defendant WVI's staff ophthalmologists.  During the patient visit, Dr. George noted only cataract symptoms, as was appropriate based on the Patient MC's Chief Complaint and HPI.  The chart also indicates that Patient MC was scheduled for a second cataracts evaluation and "Facetime" with Defendant Wang.

143.     At the second office visit that occurred on July 18, 2011, Defendant Wang noticed that Dr. George did not list a DES diagnosis on the patient's chart as is the

40

standard pre-set determination at Defendant WVI. In order to remedy this omission and maximize reimbursement to the Defendants, Defendant Wang diagnosed Patient MC with a primary diagnosis of cataracts, and a secondary diagnosis of DES without consulting with Dr. George. However, since Defendant Wang could not charge Medicare for two office visits for cataract evaluations prior to the first cataract surgery, Defendant Wang went into the file and retroactively changed Dr. George's notations to support a secondary diagnosis of DES. Defendant WVI then illegally charged Medicare for a second office visit for a DES diagnosis.

144. Relator discovered Patient MC's chart, and many other charts just like it, during the course of her normal billing duties. Defendant Wang's retroactive alterations in Patient MC's chart, which was not uncommon, demonstrates how Defendant Wang, Defendant WVI, and its agents, used spurious diagnoses to bill Medicare for office visits that were not otherwise billable to Medicare as medically necessary.

145. To the best of Relator's knowledge, these practices continued even after she left her employ at Defendant WVI in July 2011.

**D. _Evaluation & Management Violations_**

_1. Improper Upcoding of Services to the Level of E/M Services_

146. On or around late 2009 and early 2010, Relator observed regular violations of E/M service and billing guidelines.

147. While performing her duties as the billing coordinator, Relator noticed that Defendant Wang and Defendant WVI's agents routinely documented patient visits under E/M Codes when the actual work done by the physician only met the level of an Eye Exam. Such visits should have been billed under an Eye CPT code.

41

148.    As the physician's own CPT code documentation determines which CPT code is billed to Medicare, Defendant WVI's misuse of these CPT codes resulted in fraudulently upcoded bills being submitted to Medicare for reimbursement, for which the Defendants received and kept overpayments.

149.    On the front of every patient chart, Defendant WVI places a sheet with a list of commonly used CPT codes. During the visit with the patient, the physician is supposed to make all of the appropriate notations, particularly HPI, in the patient's chart. Once the visit is over, the physician then uses the cover sheet to circle the corresponding CPT code (if the correct code is one of those listed). Later, when the physician submits the charts to the billing department, the billing coordinator uses the circled CPT code(s) on the bill submitted to the payor (such as Medicare). While the billing coordinator does have the opportunity to reevaluate the appropriateness of the CPT code circled by the physician, the billing coordinator should not have to do this. Instead, the physician has a duty to choose the correct CPT code in the first instance. CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE LEARNING NETWORK, EVALUATION AND MANAGEMENT SERVICES GUIDE 8 (Dec. 2010) ("[I]t is the provider's responsibility to ensure that the submitted claim accurately reflects the services provided").

150.    Defendant WVI's misuse of these CPT codes resulted in fraudulently upcoded bills being submitted to Medicare for reimbursement as Eye Codes for which the Defendants received payments.

151.    Relator made several efforts to have Defendant Wang, Defendant WVI, and its agents, use the proper E/M Codes versus Eye Codes but the Defendants and their agents continued to use the wrong, more expensive codes.

42

152. Relator's efforts to stop this practice included writing and distributing the Audit Memorandum, routinely instructing physicians on proper coding methods during the staff meetings, and conducting informal meetings about compliance and billing questions.

153. One example of Defendant Wang, Defendant WVI and its agents' blatant disregard for proper coding occurred in early 2010. Defendant Wang's wife, ("JJ" Wang) was reviewing the list of CPT codes that is on the front of every patient's chart. Mrs. Wang noticed CPT Codes 99354 and 99355, codes that are used to indicate and seek reimbursement for extended physician visits.

154. Mrs. Wang asked several physicians why they were not circling these codes more often. Defendant Wang and Mrs. Wang held an impromptu meeting with some of Defendant WVI's agent physicians, including Dr. Helen Boerman, Dr. Dora Sztipanovits, and Dr. Lance Kugler, as well as Relator. Both Defendant Wang and Mrs. Wang continued to question why the 99354 and 99355 codes were not being used more often.

155. Relator spoke up in the meeting and informed Defendant Wang and Defendant WVI's agents that this code could only be used if the appropriate requirements were met. Relator informed everyone that CPT Codes 99354 and 99355 are only appropriate in the following circumstances: when the face-to-face time between the physician and the patient exceeds the typical time of the E/M Service provided on the same day by at least thirty (30) minutes (for CPT Code 99354) or forty-five (45) minutes (for CPT Code 99355).[4] Additionally, she explained that the time spent by office staff

---

[4] For example, if the complexity of medical decision making and documentation reaches the level of E/M Code 99204, but the extra time spent with the patient is thirty (30) minutes equating to the total

with the patient, or the time that the patient remains unaccompanied in the office must be excluded from any calculation of physician time. *Id.*

156.    After Relator's explanation of this code, Defendant Wang ignored her instructions. Instead, he instructed the staff physicians that any time a patient was scheduled to see both staff physicians as well as having a "face time" visit with Defendant Wang, the physician should circle the 99355 code, the highest-level code, regardless of whether the physician actually met with the patients for the requisite time period of forty-five (45) minutes.

157.    One of Defendant WVI's agents, Dr. Sztipanovits, questioned Defendant Wang's instruction. She explained that using this code was improper because the patient was not receiving forty-five (45) minutes of face-to-face interaction with either the staff physician or Defendant Wang. She stated that it was, therefore, improper to bill Medicare at a higher and more expensive CPT Code when the required levels of physician interaction and medical decision making were not met.

158.    Defendant Wang responded to Dr. Sztipanovits's question by shouting at her and the other physicians that they were to follow his instructions and specifically stated that they were to "mindlessly circle" CPT Code 99355 whenever a patient was scheduled to visit both a staff physician and Defendant Wang, regardless of the actual face-to-face time spent. This order to "mindlessly circle" the higher billing code without regard to minutes spent was repeated several more times to the staff physicians by Defendant Wang during the meeting.

---

threshold time of forty (40) minutes, then CPT Code 99354 is appropriate; if the total threshold time reaches 85 minutes, then CPT Code 99355 is appropriate.

44

159.    A few days after this conversation, Relator went back to Defendant Wang with further guidance on how to properly use these codes. Despite her efforts, Relator noticed that the Defendant Wang and Defendant WVI's agents were misusing these CPT codes and illegally submitting them to Medicare regardless of time spent with patients.

160.    CPT codes 99354 and 99355 were not the only E/M codes that Defendants and their agents fraudulently billed. For instance, the Corcoran Audit provided specific examples of the misuse of CPT Code 99204. In these examples, the Eye Code 92004—which yields a reimbursement about twenty dollars ($20.00) lower than the reimbursement for E/M Code 99204—should have been used instead of E/M Code 99204. However, Corcoran's random-sampling of patient charts, as documented in the Corcoran Audit, showed several patients for whom Medicare was improperly billed using the higher 99204 code. Specifically, the Corcoran Audit found:

| Date | Patient Account No. | CPT Code Charge | Proper CPT Code suggested by Corcoran | Reason for changing CPT code |
|------|---------------------|-----------------|---------------------------------------|------------------------------|
| 10/25/2010 | 95252 | 99204 | 92004 | Insufficient documentation to support E/M Level Billed; Eye Code is a Better Choice |
| 11/1/2010 | 95308 | 99204 | 92004 | Insufficient documentation to support E/M Level Billed; Eye Code is a Better Choice |
| 11/1/2010 | 95230 | 99204 | 92004 | Insufficient documentation to support E/M Level Billed; Eye Code is a Better Choice |

161.    In Relator's capacity as the medical billing coordinator, she found these randomly-selected examples by Corcoran were demonstrable of Defendants' daily practice prior to the Audit.

162.    To the best of Relator's knowledge, Defendant WVI never corrected those illegal and improperly billed E/M visits, never reported the errors to Medicare, and never reimbursed Medicare for the improperly received reimbursement.

### 2. *Improper Execution of E/M Physician Visits and Chart Documentation*

163.    Defendant Wang and Defendant WVI frequently, illegally, and fraudulently used Technicians to carry out E/M physician visits with patients and fill out the corresponding chart documentation from those visits.

164.    Medicare's 1997 Documentation Guidelines for Evaluation and Management (E/M) Services spells out the limited role Technicians (the E/M Guidelines refer to them as "ancillary staff") may play in patient interactions. When interacting with the patient before the physician arrives, a Technician may record the Review of Systems ("ROS") and/or the Past, Family, and/or Social History ("PFSH"). A Technician may not, however, interview the patient about or record the History or Present Illness ("HPI").

165.    From the time Relator started working at Defendant WVI's office, it was normal practice for Defendants Wang and WVI to have Technicians interview the patient concerning, and to record, the HPI.

166.    In April 2011, as noted, Defendants Wang and WVI retained Riva Lee to perform a second audit in addition to the Corcoran Audit. One of the major points that Defendants Wang and WVI discussed with Riva Lee was whether or not a Technician could interview patients and record HPI.

46

167. On or about April 14, 2011, Ms. Riva Lee sent an email to Defendant Wang and Relator, among others, informing the Defendants that it was highly improper for Technicians to be recording HPI. In the email, she wrote that she "**suspect[s] your practice is seriously out of compliance**," that continuing with the status quo was "high risk", and strenuously suggested that Defendant Wang, Defendant WVI and its agents begin to comply properly with Medicare requirements. (emphasis added).

168. In this same email string, Defendant Wang wrote to Relator saying, "I will take care of the HPI issue, myself, so, you don't have to worry about it. . . . I will talk to Riva Lee directly myself and take care of it!"

169. Contrary to Defendant Wang's assurances to Relator, he did not "take care of it." Instead, Defendant Wang devised a procedure he believed would circumvent Medicare's E/M guidelines concerning HPI.

170. During a staff meeting in or around April 2011, Defendant Wang instructed the Technicians to record the HPI just as before, but write it on a Post-It note placed inside the patient's chart. Then the physician performing the office visit would merely transcribe the information from the Post-It note into the patient chart in his or her own handwriting, but without actually interviewing the patient about the HPI. Defendant Wang then instructed that the Post-It notes be shredded.

171. During this same meeting, Defendant Wang organized a time for the Technicians to shadow Dr. Boerman in patient visits, and ordered Dr. Boerman to instruct the Technicians on how to fill out these Post-It notes.

172. Through this practice, Defendant Wang charged Medicare for a more expensive E/M Service that required a physician's actions, not "ancillary staff," without

47

the physicians actually performing the required amount of complex medical decision-making associated with the E/M Service billed.

### E. Non-Credentialed Physicians Performing Services on Medicare Patients and Billing Medicare Under Defendant Wang's Name and Billing Number.

173.    As noted above, a physician must be credentialed with Medicare in order to bill Medicare for services provided to a Medicare patient. Also, a credentialed physician may only use his or her Medicare billing number to charge for services personally performed by that physician.

174.    On or about January 2010, Relator frequently witnessed non-Medicare credentialed physicians treating Medicare patients and then giving patient charts to credentialed physicians for their signatures. Then, as part of her duties, Relator saw Defendant WVI using Defendant Wang's name and billing number to fraudulently charge Medicare for the services.

175.    Even though Relator raised her concerns about this practice when she first discovered it in January 2010, Defendants address her concerns.

176.    It was not until the October 8, 2010 conference call between Corcoran consultant Mary Pat Johnson, Relator and Dr. Helen Boerman that the Defendants realized the enormity of their mistake. During this phone call, Dr. Boerman wrote many notes that she later relayed to Defendant Wang regarding the statements made from Corcoran. Among these handwritten notes are many statements that demonstrate the level of the Defendants' noncompliance. Specifically, Dr. Boerman wrote:

> a.  "Credentialed Drs. (Dr. B[oerman], S[ztipanovits], W[ang]) can only bill if they provide care—you examine the patient and make a separate clinic note and physical evaluation";

48

b. Noting that getting each physician credentialed with Medicare is "mandatory!";

c. Noting that physicians "cannot just sign charts" for patients seen by non-Medicare credentialed physicians; and

d. Noting that Defendants Wang and WVI must get into "immediate [Medicare] compliance."

177. After the Corcoran Audit, Defendants took steps to try to ensure that physicians who saw Medicare patients and billed Medicare were Medicare credentialed. The Defendants did not, however, take steps to refund any of the money fraudulently received from Medicare or overpaid by Medicare, nor did they self-report the illegal billing to CMS, with respect to the illegal use of Defendant Wang's name and medical record number.

### F. *Lacrimal Punctal Occlusion: Violations of Medical Necessity, Surgical Performance, Billing Practices*

178. Relator observed that Defendant WVI routinely violated Medicare requirements with respect to its punctal plug practice and fraudulently and illegally billed Medicare. These violations include:

a. Egregiously violating Medicare regulations and Tennessee law by instructing and permitting Technicians to perform the actual surgery;

b. Violating medical necessity by performing surgical treatment first instead of pursuing non-surgical treatments as required by CMS; and

c. Improperly splitting up the diagnostic office visit and the punctal plug insertion in order to improperly charge Medicare for multiple office visits.

*1. Defendants Wang and WVI Violated Medicare Regulations and State Laws by Allowing Unlicensed, Non-Physicians to Perform Punctal Plug Surgery on Patients.*

179. Medicare categorizes LPO through the insertion of punctal plugs to be a minor surgery carrying a ten-day global surgery period.

49

180.     Medicare defers to the states in defining "physician," and then relies on each state to determine the proper scope of a physician's practice areas.  42 U.S.C. § 1395x(r).  As noted above, Tennessee does not allow any person who lacks a medical license to practice medicine, and performing surgery falls within Tennessee's definition of practicing medicine.

181.     As described above, Defendant WVI's Technicians had no formal medical training, and they did not hold licenses to practice medicine from the Tennessee Board of Medical Examiners.  Therefore, it was a direct violation of Tennessee state law, and, by extension, Medicare regulations, for Technicians to perform punctal plug surgery.

182.     Shortly after Relator started working at Defendants' office, she noticed that the Defendant WVI's physician agents were not performing the actual insertion of the punctal plugs.  Instead, the physicians would see the patient during the related office visit, and when the office visit was complete, a Technician would be called in to perform the surgery on patients' eyes.

183.     During Relator's tenure at Defendant WVI, Relator personally witnessed the following Technicians performing punctal plug surgery: Laura Fuston, Jessie Schultz, Patty Kidd, Nic Hord, and Amy Sensing, none of whom are licensed physicians.  Despite having Technicians perform surgeries, Defendant WVI fraudulently billed Medicare for these punctal plug surgeries as if physicians performed them.

184.     At no point during Relator's time working at Defendant WVI did the Defendants stop this practice, and the practice was still occurring when she left.  To the best of Relator's knowledge, this practice is still occurring as of the date of the filing of this complaint.

185.    Medicare expects that any physician treating a patient with DES will develop a remedial plan that focuses on non-surgical methods of treatment before moving onto a surgical procedure such as LPO with punctal plugs.

186.    Defendant Wang, Defendant WVI and its agents violated this medical necessity protocol. Instead of treating their patients with non-surgical procedures first, Defendant Wang, and Defendant WVI's agent physicians would skip these less invasive, non-surgical methods and would instead perform punctal plug surgery immediately, as the only method of treatment. In addition, Defendant Wang and Defendant WVI's agent physicians would not perform the required medical testing or symptom management before determining that punctal plugs were a necessary form of treatment.

187.    As further proof that Defendants' violated medical necessity in treating DES, punctal plug surgeries made up a disproportionately large share of Defendants' Medicare claims. . In Relator's summer 2010 Audit Memorandum, she noted that in April 2010, out of 110 Medicare claims submitted, over nineteen (19) of them were punctal plug surgeries. In May 2010, of the seventy-three (73) Medicare claims submitted, over seventeen (17) of them were punctal plug surgeries. These rates made Defendant WVI an outlier in terms of punctal plug surgeries.

188.    The Corcoran Audit also uncovered evidence of Defendant's practice of skipping non-surgical treatment. Of the fifty-charts chosen at random by Corcoran, three of them pertained to punctal plugs. Of those three, two lacked the required documentation to support the procedure as medically necessary, as the required interim steps were skipped. As discussed above, there must be lengthy documentation in a

51

patient's chart showing that (1) punctal plugs are necessary, (2) prior non-surgical methods to treat DES were attempted, (3) the patient understood the risks and benefits of the procedure, and (4) records of the procedure itself. Defendant Wang, Defendant WVI and its agents routinely failed to meet these documentation requirements. The Corcoran Audit revealed specific examples of this documentation failure:

| Date | Patient Account No. | CPT Code Charge | Corcoran's Notes on Billing Practices |
|------|---------------------|-----------------|---------------------------------------|
| 10/25/2010 | 86422 | 68761 E1 | Weak documentation of Procedure |
| 11/01/2010 | 88562 | 68761 E2 68761 E4 | Weak documentation of Procedure |

189.    As proper and complete documentation is a critical part of medical necessity, *see In re Lad E. Rubaum, supra* ¶¶ 35, 50, performing punctal plugs with a "weak documentation of procedure" constitutes a Medicare violation. Thus, Defendants billed Medicare as if the proper progression of medically necessary procedures had been followed when, in fact, it had not. The bills Defendants submitted to Medicare were thus false and fraudulent.

190.    Defendant Wang, Defendant WVI and its agents also violated medical necessity in their methods of long-term DES treatment with punctal plugs. As discussed above, punctal plugs are available in both temporary collagen plugs and permanent silicon plugs. The physician's decision to use the temporary or permanent plugs must be based on the patient's individualized needs (*i.e.*, a determination of medical necessity for the type of plug selected). But where a physician has determined to use punctal plugs as a long-term solution for DES, Medicare expects the physician to use permanent, silicon plugs unless some stated medical reason justifies using different, non-permanent plugs.

191.    In the Summer of 2011, Relator learned that Defendant Wang, Defendant WVI, and its agents regularly used temporary collagen punctal plugs when treating patients who should have received permanent punctal plugs.

192.    Dr. Mark Raymond[5] informed Relator that Defendant Wang, Defendant WVI and its agents often used temporary plugs multiple times in the same patient as a long-term DES treatment plan.  As permanent plugs and permanent tear duct closure is possible, Dr. Raymond explained to Relator that Defendant Wang was using temporary plugs as a way to increase his revenue stream by having to replace them multiple times.

193.    Dr. Raymond informed Relator that permanently closing the lacrimal punctum of a DES patient would make it almost impossible for Defendant Wang to charge Medicare for a second patient visit or global surgery charge.  Consequently, Dr. Raymond explained that in order to produce more revenue, Defendant Wang would only authorize the implantation of temporary plugs, which can last anywhere between two weeks to three months, thereby requiring the patient to return for new plugs to be implanted every few weeks or every few months, resulting in multiple, unnecessary charges to Medicare for each time they were replaced.

194.    Implanting a series of temporary collagen plugs is not a reasonable or necessary treatment for patients in need of permanent lacrimal punctal closure.  *Cf. Clinical Policy Bulletin No. 0457: Dry Eyes*, AETNA (Mar. 25, 2011), http://www.aetna.com/healthcare-professionals/policies-guidelines/cpb_alpha.html.

---

[5] Dr. Mark Raymond is an Ophthalmologist with over twenty years experience who currently works in Nebraska.  He came to Defendant WVI in 2011 to learn about LASIK under Defendant Wang's tutelage.  Dr. Raymond left Defendant WVI after approximately one-month's time in large part because of his concern regarding patient safety.  During his time at Defendant WVI, Dr. Raymond had frequent conversations with Relator in which he explained that various Medicare violations were occurring at Defendant WVI.

53

Therefore, this practice of requiring repeat patient visits is not medically necessary and violates Medicare billing requirements.

### 3. *Charging Medicare for Improper Office Visits*

195.     LPO with punctal plugs is a minor surgery with a ten-day global surgery package. Because it is a minor surgery, the cost of the initial evaluation of the problem by the surgeon to determine the need for surgery (*i.e.*, the office visit) is included in the surgery's global package. CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 40.1(A)-(B) (2011), https://www.cms.gov /manuals/downloads/clm104c12.pdf; *id.* at § 40.2(A)(4) ("Moreover, where the decision to perform the minor procedure is typically done immediately before the service, it is considered a routine preoperative service and a visit or consultation is not billed in addition to the procedure."). Additionally, "[v]isits by the same physician on the same day as a minor surgery . . . are included in the payment for the procedure . . . ." *Id.* at § 40.1(C).

196.     These regulations mean that a physician cannot bill for an office visit on the same day as a minor surgery if both the surgery and office visit pertain to the same diagnoses. When a patient comes in for an LPO with punctal plugs, both the office visit and the surgery result from the same diagnosis of DES. Therefore, the office visit is not individually billable, but is paid for by the global surgery package. The only way an office visit performed on the same day as an LPO with punctal plugs can be individually charged to Medicare is if the office visit results from a "significant, separately identifiable service" that stems from a diagnosis other than DES. This "significant,

separately identifiable service" is identified by the use of a billing modifier, in this case modifier -25.

197.    As part of Defendant WVI's method of operating, Defendant Wang ordered his physician staff to diagnose the need for punctal plugs during one office visit, but not perform the surgery on the same day. Instead, Defendant Wang, Defendant WVI, and its agents would make the patient schedule another visit for the *sole* purpose of plug insertion and then charge Medicare for a second unnecessary E/M office visit.

198.    In order to avoid detection for this double billing, Defendant Wang instructed Defendant WVI's agents to establish multiple diagnoses during the initial visits (a primary, secondary, and tertiary diagnosis), and then use one of those different diagnoses, such as Blepharitis, plus modifier -25 as the basis for the subsequent office visit when the plugs would actually be inserted.

199.    This practice violates Medicare's medical necessity requirement and its global surgery billing practices as punctal plugs are typically inserted on the same day as the office visit that determines their necessity. A second visit is not medically necessary and should not be billed. Defendants also violated Medicare's medical necessity requirement by ordering doctors to record a primary, secondary, and tertiary diagnosis prior to even seeing a patient.

200.    Relator discussed this improper practice with Dr. Raymond. Dr. Raymond told Relator that Defendant Wang instructed him and every other physician at Defendant WVI to always bring patients back in one week after the initial evaluation for the insertion of the plugs, but to arrange and bill the second visit under a different diagnosis. He explained that the chart notation "plugs if indicated" was code for the patients to

55

return to Defendant WVI solely for a plug insertion, regardless of any other notation to the contrary, including other diagnoses.

201.    For the large majority of punctal plug patients, Defendant Wang, Defendant WVI and its agents never had any true medical necessity to justify separating the diagnostic office visit from the insertion of the punctal plugs. Defendants recorded false diagnoses for these patients as a way to justify providing E/M service as a "significant, separately identifiable code" and, ultimately, to bill Medicare for an office visit that should have been included in the global surgery package.

202.    The three punctal plugs charts involved in the Corcoran Audit show how Defendants fraudulently charged these second office visits to Medicare under an E/M Code (CPT code in 99000 range). Specifically, the Corcoran Audit found:

| Date | Patient Account No. | CPT Code Charge | Corcoran's Notes on Billing Practices |
|------|---------------------|-----------------|----------------------------------------|
| 10/25/2010 | 86422 | 99212 | |
| | | 92285 | No documentation of Interpretation |
| | | 68761 E1 | Weak Documentation of procedure |
| 10/27/2010 | 85810 | 99212 -25 68761 E1 68761 E4 | |
| 11/01/2010 | 88562 | 99213 -25 | |
| | | 68761 E2 | Poor documentation of procedure |
| | | 68761 E4 | Poor documentation of procedure |

203.    To the best of Relator's knowledge, these practices are still occurring as of the date of filing for this complaint.

**G.**    ***Defendant WVI Violated Medical Necessity While Performing Patient Services and In Its Billing Methods, Both of Which Resulted in the Defendants Submitting Fraudulent Bills to Medicare***

56

204.    Defendants consistently and knowingly violated medical necessity

standards, fraudulently billing Medicare, receiving unjust reimbursement, and seriously

threatening patient health and wellbeing. These violations included:

a.  Performing first and second eye cataract surgery before surgery was medically
    necessary, and improperly conducting diagnostic tests used to diagnose the
    need for cataracts in order to fraudulently create documentation of medical
    necessity;

b.  Performing YAG Capsulotomy Procedures on nearly every patient who
    underwent cataract surgery even when a YAG procedure was not medically
    necessary;

c.  Performing and billing for all diagnostic tests and exams supported by a
    particular diagnosis instead of performing only those tests and exams
    medically necessary for the particular patient;

d.  Charging office visits for treatment of the same ailment under an artificial
    primary diagnosis in order to receive reimbursement for office visits otherwise
    prohibited by Medicare guidance or Global Surgery Packages;

e.  Routinely making illegal notations on patient charts, such as: creating and
    signing patient charts, post-operative notes, and noting diagnoses on patient
    charts prior to the physician actually performing the office visit or physician
    service (*i.e.*, using "canned" charts); retroactively altering patient charts in
    order to provide a supporting diagnosis and required medical necessity
    documentation for subsequent office visits, procedures, and surgeries; and
    instructing physicians to leave chart notations intentionally vague so as to
    make illegal alterations more difficult to detect.

Each of these medical necessity violations, which constitute illegal billings, will be

discussed below.

### 1. *Performance of First and Second Eye Cataracts Surgeries When Not Medically Necessary*

205.    Cataract surgery, just like any other surgery, requires extensive

documentation from various tests showing that it is the last remaining option to provide

patients the relief needed before it can be properly billed to Medicare.  If the testing

57

demonstrates that the cataract is not "ripe," meaning that it is not severe enough to warrant surgical removal, then the surgery should not be pursued.

206.     In the summer of 2011, Relator learned that Defendant Wang was improperly performing several of the tests used to diagnose the severity of a patient's cataract. Dr. Raymond explained to Relator how Defendant Wang, by performing these tests improperly, was able to convince a patient that his or her cataracts were more advanced than they actually were, and that surgery was necessary.

207.     For instance, Defendant Wang would improperly perform Glare Sensitivity Testingto convince a patient that cataract surgery was necessary. As a cataract affects the way the eye focuses light on the retina (the opacity in the lens causes the light to scatter instead of focusing on the retina), a Glare test is used to measure how much light scatters, ultimately measuring the density of the cataract on the lens. Defendant Wang would perform this test in such a way that exaggerated the patient's seeing difficulty to an artificial level.

208.     The glare sensitivity test is supposed to be performed in a manner where the light is shone through the side of the patient's eye, illuminating the cataract, and then measuring the vision impairment by having the patient perform a standard eyesight test. Instead of performing the test in this manner, Defendant Wang would shine the light directly into the patient's eye and then ask the patient to read the eye chart. As the direct light nearly blinds the patient, the patient performs poorly on the reading test, and exaggerates the severity of the cataract.

209.     After the test, the patient would be convinced that cataract surgery was not just the only remedy left, but that it was immediately necessary. As a result of this

improper testing, Defendant Wang often performed unneeded surgery on "unripe" cataracts. As few of Defendant Wang's patients were sophisticated enough to get second opinions, the patients usually agreed to the surgery.

210.    Defendant Wang also instructed Defendant WVI's agents to fraudulently alter patient charts in order to support a cataracts diagnosis. One of the ways Medicare checks for proper medical necessity is by verifying that the patient's Chief Complaint (the reason why the patient came into a physician's office) corresponds to the physician's notes and diagnoses. The Chief Complaint should always be described in the patient's own words, and under no circumstances should it be altered. *See* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE LEARNING NETWORK, EVALUATION AND MANAGEMENT SERVICES GUIDE 10 (Dec. 2010) ("A C[hief] C[omplaint] is a concise statement that describes the symptom, problem, condition, diagnosis, or reason for the patient encounter. The CC is usually stated in the patient's own words. . . . The medical record should clearly reflect the CC.").

211.    Defendant Wang often instructed his staff physicians to change the patient's chief complaint during a cataract diagnostic visit in order to justify billing Medicare for cataracts related diagnostic tests, and the subsequent performance of the cataract surgery itself.

212.    In a January 28, 2011 email and the corresponding staff meeting, Defendant Wang instructed Defendant WVI's agents that during a cataract screening visit, the physician is to review and revise the Chief Complaint to make sure that it corresponds with the cataract diagnosis marked down during the patient's physical exam. Defendant Wang again echoed this instruction in a July 25, 2011 email, instructing the

physicians to change the Chief Complaint to support a cataract diagnosis, and to include a notation that the patient has "trouble driving" on every patient's chart.

213. Cataract surgery is a unilateral procedure, and so Medicare requires a clear demonstration of medical necessity that surgery in both eyes is necessary before it will pay for the additional surgery. To prove necessity, the surgeon must perform surgery in the first eye, evaluate the results of the first procedure, and only if the first-eye surgery does not yield a sufficient remedy for the patient may the surgeon pursue surgery on the second eye.

214. Defendant Wang often performed second-eye surgery with sub-standard or completely insufficient documentation to support the medical necessity of the procedure. One reason medical necessity documentation was so severely lacking is because Defendant Wang routinely filled out patients' post-operative charts with notes *prior* to actually conducting the post-operative visits.

215. For example, on Tuesday, June 28, 2011, Relator came across a chart for Patient "R.F." while performing her billing duties. As she reviewed the chart, she noticed a page dated July 6, 2011—eight days in the future. This chart prominently stated that it was a Wang Vision Post-Op Evaluation form, to be used only for cataract post-op office visits. This page contained markings as if the post-op evaluation was actually performed, and Defendant Wang signed and dated it July 6, 2011.

216. This practice constitutes a blatant violation of medical necessity, as it is impossible for a physician to render a service that meets the medical necessity standards of reasonable and necessary if the notations are not based on actual interaction between the physician and the patient.

60

217. Upon further investigation, Relator discovered that this was not the first patient for whom Defendant Wang used "canned" charts to fraudulently bolster medical necessity prior to seeing the patient.

218. The Corcoran Audit also provided evidence of severe deficiencies in medical necessity documentation associated with Defendant Wang's cataract surgery practice. Of the fifteen cataract charts that Corcoran reviewed, eight of them suffered from poor documentation of medical necessity. Of those eight, six of them were second-eye cataract surgeries. Specifically, the Corcoran Audit found:

| Date | Patient Account No. | CPT Code Charge | Corcoran's Notes |
|------|--------------------|-----------------|------------------|
| 10/26/2010 | 94840 | 66984 79LT[6] | Poor documentation of medical necessity |
| 10/26/2010 | 6677 | 66984 79LT | Poor documentation of medical necessity |
| 10/26/2010 | 94829 | 66984 79LT | Poor documentation of medical necessity |
| 10/26/2010 | 94750 | 66984 79LT | Poor documentation of medical necessity |
| 10/26/2010 | 91528 | 66984 79LT | Poor documentation of medical necessity |
| 10/28/2010 | 94993 | 66984 RT | Poor documentation of medical necessity |
| 10/28/2010 | 91800 | 66984 79LT | Poor documentation of medical necessity |
| 10/28/2010 | 94915 | 66984 RT | Poor documentation of medical necessity |

### 2. Performing YAG Capsulotomies at an Excessive Rate and Prior to When Medically Necessary.

219. Just as with many of the cataract surgeries, Defendant Wang rushed to perform YAG Capsulotomies on patients before it was medically necessary. The rate at which YAG procedures occurred at Defendant WVI startled Relator. While the need for a YAG procedure is directly tied to the occurrence of cataract surgery, not all patients who undergo cataract surgery need a YAG procedure.

---

[6] CPT Code 66984 is the CPT code for cataract surgery. Modifier "-79" is used to "report an unrelated [surgical] procedure by the same physician during a postoperative period." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL PUB. 100-04, ch. 12, § 40.1(A)(7) (2011), https://www.cms.gov /manuals/downloads/clm104c12.pdf. The use of this modifier in this instance demonstrates that this left eye surgery (indicated by the "LT" notation) was a second eye cataract surgery.

61

220.    On or around the late spring/early summer of 2011, Dr. Raymond confirmed Relator's concerns that Defendant Wang and Defendant WVI performed YAG procedures at such an excessively high rate to make Defendant WVI an outlier.

221.    Dr. Raymond informed the Relator that Defendant Wang instructed him to perform YAG procedures as a matter of course on nearly every post-operative cataract patient treated at Defendant WVI, instead of only performing the procedure on those patients for whom it was medically necessary.

### 3. *Improperly Charging Medicare for An Additional Office Visit to Diagnose Cataracts and Convince Patients That Cataract Surgery Was Necessary By Using a Secondary Diagnosis*

222.    It was common practice for patients at Defendant WVI to have two office visits, usually a week apart, specifically dealing with the diagnosis and treatment of cataracts prior to surgery in the first eye. Medicare "does not routinely cover testing other than one comprehensive eye examination . . . and an [ultrasound] A-scan," but it will pay for additional tests and office visits where "there is an additional diagnosis and the medical need for the additional tests is fully documented." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE NATIONAL COVERAGE DETERMINATION MANUAL, ch. 1, part 1, § 10.1(A) (129 rev. ed. 2010), https://www.cms.gov/Manuals/iom/ItemDetail.asp?ItemID=CMS01496.

223.    In order to obtain payment for this prohibited second cataract screening visit, Defendant Wang, Defendant WVI, and its agents billed these second cataract screening visits under different diagnoses. As described above, Defendant Wang provided, and instructed Defendant WVI's agents to provide, a primary, secondary, or tertiary diagnosis during the patient's first visit; oftentimes DES was the additional

diagnosis used. Then Defendant Wang ordered the other physicians to separately list the secondary or tertiary diagnosis from the first visit as the primary diagnosis for the patient's second cataract screening visit in order to circumvent Medicare's regulation that allows reimbursement for only one cataract pre-operative visit. CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE NATIONAL COVERAGE DETERMINATION MANUAL, ch. 1, part 1, § 10.1(A) (129 rev. ed. 2010), https://www.cms.gov/Manuals/iom/ItemDetail.asp?ItemID=CMS01496.[7] Using these spurious alternative diagnoses allowed Defendant WVI to obtain Medicare reimbursement for a prohibited second office visit.

224.    Relator learned of this prohibited practice during the weekly Research and Management meetings the Defendants held. Defendant Wang's explicit instructions to the other physicians are apparent in the Agenda Emails. For example, in a November 20, 2010 email, Defendant Wang instructed Defendant WVI's agents that when the patient comes back in for a second Cataract Screening Visit, the staff should "please be sure to write down, at this return visit, as #1 diagnosis anything other than cataract, otherwise that 2nd visit won't get paid."

225.    Again, in an email dated January 8, 2011, Defendant Wang instructed Defendant WVI's agents that during a second Cataract Screening Visit, they should be sure to write down a DES diagnosis or a diagnosis of Primary Open Angle Glaucoma as the primary diagnosis and reason for the office visit, otherwise Medicare will not pay for the second visit. Defendant Wang repeated this exact instruction again many times.

---

[7] Medicare "does not routinely cover testing other than one comprehensive eye examination . . . and an [ultrasound] A-scan . . . . Claims for additional tests are denied as not reasonable and necessary unless there is an additional diagnosis and the medical need for the additional tests is fully documented." CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE NATIONAL COVERAGE DETERMINATION MANUAL, ch. 1, part 1, § 10.1(A) (129 rev. ed. 2010), https://www.cms.gov/Manuals/iom/ItemDetail.asp?ItemID=CMS01496. Medicare will only pay for a second pre-surgery cataract evaluation when a second evaluation is medically necessary and is supported by the required documentation.

63

226.     Then in July 2011, after working with both the Corcoran consultants and Riva Lee, Defendant Wang instructed Defendant WVI's physicians that during the second new Cataract Screening Visit, the physicians should look at the notes from the first visit, and if they see a notation for DES, write down DES as the primary diagnosis for the second visit. If the first visit revealed positive results from a Humphrey Vision Field test (a test used to diagnose glaucoma), then the primary diagnosis for the second visit should be Primary Open Angle Glaucoma.

227.     These and many other emails indicate how Defendant Wang instructed Defendant WVI's staff and physicians to use spurious diagnoses when performing and billing the second new patient Cataract Screening Visit. This process ensured that Medicare would pay for this additional office visit, even though the visits were not medically necessary to diagnose or treat a medical problem, and Defendants should never have billed Medicare for them in the first place.

228.     Additionally, in the same July 25, 2011 email noted above, Defendant Wang instructed all staff to keep "limited notation in charts." Defendant Wang's instruction to "limit notation in charts" was an order to intentionally keep chart documentation vague in order to aid in this deception and make it difficult for Medicare to decipher this fraudulent practice should an audit occur.

229.     These email excerpts show how Defendant Wang instructed Defendant WVI's staff to fabricate medical necessity documentation and illegally bill and receive reimbursement for office visits that Medicare would not otherwise pay for.

   4.  *The Creation of a "Master List" of Diagnoses and Corresponding Diagnostic Tests, Using This List to Bill Medicare for Medically Unnecessary Tests & Improper Documentation of Diagnostic Tests*

64

230.    Another example of Defendants' routine violation of medical necessity

started on or around mid-April 2011.  At that time, Defendant Wang wrote Relator an

email asking her to walk him and the other staff physicians through every billing and

reimbursement step related to cataract diagnosis and surgery.

231.    This email and a subsequent meeting revealed Defendant Wang's desire

for Relator to make a master list of every diagnosis and the corresponding diagnostic tests

for which Medicare would pay in relation to the diagnosis.

232.    For example, for a diagnosis of cataracts, some of the diagnostic tests for

which Cahaba will reimburse are: slit lamp procedures, dilated ophthalmoscopy, and an

intraocular pressure exam.  Even though these and other tests are appropriate when a

patient has a diagnosis of cataracts, a diagnosis is not a free license to perform all

possible tests.  Only those tests that are medically necessary should be performed and

billed to Medicare.

233.    As explained in a July 6, 2011 email to Relator and other Defendant WVI

agents, Defendant Wang did not want Relator to create this list in order to decipher which

tests are or are not covered by Medicare.  Instead, he wanted this list in order to start

charging Medicare for *all* allowable tests, regardless of medical necessity.   Specifically,

Defendant Wang wrote:

> I discovered that we may have lost some money, in not having submitted bills
> for some COVERED pre-CSX testing services!
>
> While Medicare/insurance indeed do not cover prophylactic tests (such as
> OCT and specular microscopy, that we do for every CNS patient) without an
> established medical diagnosis, they DO cover these tests if there are
> established medical diagnosis for them . . .
>
> Hence, from now on, let's do the following:
> 1. For a p[atient] with cataract who undergoes CNS, and has an established

one of these medical diagnosis, we should make sure that **all proper COVERED tests are indeed performed**.

2. And, we should make sure that all of these COVERED tests are **circled on the yellow sheet and submitted together with their corresponding diagnosis.** (emphasis in original).

234. By "proper covered tests," Defendant Wang was not referring to medically necessary testing. Instead, this email demonstrates that Defendant Wang wanted Defendant WVI's agent physicians to examine the patient chart, and for established diagnoses that the patient had, the physician should perform "all" tests that Medicare will pay for, even if they are not medically necessary.

235. In a subsequent Agenda Email written by Defendant Wang on July 25, 2011, he again instructed Defendant WVI's agent physicians that when performing a "CNS1 and CNS2[8] [office visit], <u>for established patients, please DO code the diagnosis and tests,</u> since we WILL get paid!" (emphasis in original).

236. Defendants also routinely violated documentation requirements for the diagnostic tests that were performed. Proper documentation of a diagnostic test requires the physician's order for the test, confirmation that the test was completed, and an interpretation of the test results. Without these three things, a diagnostic test does not have sufficient documentation to demonstrate its medical necessity, and therefore should not be billed to Medicare.

237. Relator observed serious flaws in the Defendants' documentation of diagnostic tests. Specifically, there was either *no* diagnostic test interpretation, or the little that did exist was insufficient for billing purposes. In her Summer 2010 Audit

---

[8] "CNS1" means a Cataract New Screen first visit, which is the notation used to describe the first office visit that a patient undergoes during a cataract screening. "CNS2" means a Cataract New Screen second visit, which is the notation used to describe the second office visit needed to sell the patient on the necessity of cataract surgery, and which was nearly always billed to Medicare under a spurious diagnosis.

66

Memorandum, Relator reminded the Defendants and their agents that an interpretation

and report for diagnostic tests are required for proper billing, and that a copy of the test is

not a sufficient replacement for this interpretation.

238.    Despite Relator's efforts, the Defendant WVI and its agents, including

Defendant Wang did not stop this practice of poor interpretation documentation.  The

Corcoran Audit revealed many instances of this poor documentation.  Specific instances

include:

| Date | Patient Account No. | CPT Code Charge | Corcoran's Notes |
|------|---------------------|-----------------|------------------|
| 10/18/2010 | 95149 | 92135 -50 | No documentation of interpretation |
|  |  | 92285 | No documentation of interpretation |
| 10/20/2010 | 7148 | 92136 | No documentation of interpretation/ IOL calculation |
| 10/20/2010 | 2292 | 92136 | No documentation of interpretation/ IOL calculation |
| 10/25/2010 | 95095 | 92136 | No documentation of interpretation/ IOL Calculation. Poor documentation of medical necessity |
| 10/25/2010 | 86422 | 92285 | No documentation of interpretation |
| 10/25/2010 | 95272 | 92136 | No documentation of interpretation/ IOL calculation |
| 10/27/2010 | 95258 | 92285 | No documentation of interpretation |
| 10/27/2010 | 95303 | 92136 | No documentation of interpretation/ IOL calculation |
| 10/27/2010 | 95244 | 92285 | No documentation of interpretation |
| 11/01/2010 | 94011 | 92285 | Weak documentation of interpretation |
| 11/01/2010 | 95316 | 92285 | No documentation of interpretation |
| 11/01/2010 | 95328 | 92136 | No documentation of Interpretation/ IOL calculation |
| 11/01/2010 | 95283 | 92285 | No documentation of interpretation |
| 11/01/2010 | 92713 | 92285 | No documentation of interpretation |
|  |  | 92025 | No documentation of interpretation |

239.    Even after the Corcoran Audit, the Defendants and their agents failed to

provide the proper amount of physician oversight to bill these tests.

67

240.    Instead of meaningfully examining the test results so as to be able to properly determine a patient's medical issues, the Technicians who performed the tests would hand the charts off to any physician they happened to see in the hallway and have the physician sign the chart. The Technicians never sought out, and were never encouraged to seek out, the physician who actually ordered a particular test.

241.    Defendant Wang directly instructed this improper behavior in several of his Agenda Emails. In his November 20, 2010 Agenda Email, Defendant Wang instructed his staff that "in-serve techs, at a tech-test visit, right after a test, to look for *any* doctor, to sign the interpretation sheet and **code the superbill**." (emphasis in original). Defendant Wang repeated this instruction in his Agenda Emails dated December 28, 2010, January 8, 2011, January 15, 2011, January 22, 2011, January 28, 2011, February 4, 2011, February 10, 2011, and July 25, 2011.

242.    These routine and intentional violations resulted in Medicare reimbursing the Defendant WVI for diagnostic tests that were not medically necessary and that did not meet the required documentation standards of physician oversight.

243.    To the best of Relator's knowledge, all of the above conduct was done intentionally and/or with the reckless disregard for or deliberate indifference to Medicare regulations and corresponding billing requirements. By and through Defendant's actions described above, the Government paid these claims and sustained damages.

## VIII. COUNT I
### False Claims Act 31 U.S.C. §3729(a)(1)(a)

244.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

245. This is a claim for treble damages and for civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(a).

246. By virtue of the acts described above, Defendant WVI and Defendant Wang knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

247. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

248. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount yet to be determined.

## IX. COUNT II
### False Claims Act 31 U.S.C. §3729(a)(1)(b)

249. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

250. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

251. By virtue of the acts described above, Defendant WVI and Defendant Wang knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b).

252. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

253. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

69

# X. PRAYER FOR RELIEF

WHEREFORE, Relator prays, on behalf of the United States and herself that, on final trial of this case, judgment be entered in favor of the United States and against Defendants as follows:

1. On the First Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

2. On the Second Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law; and

3. For the costs or this action, prejudgment interest, interest on the judgment and for any other and further relief to which Plaintiffs, the United States and Relator, may be justly entitled.

## XI. DEMAND FOR JURY TRIAL

Relator demands a trial by jury on all issues of triable fact in the foregoing

complaint.

Dated: March 29, 2012

Respectfully submitted,

George E. Barrett (TN Bar No. 2672)
David W. Garrison (TN Bar No. 24968)
Scott P. Tift (TN Bar No. 27592)
BARRETT JOHNSTON, LLC
217 Second Avenue North
Nashville, TN 37201
Phone: 615-244-2202
Facsimile: 615-252-3798
gbarrett@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Brian J. Markovitz
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Phone: (301) 220-2200
Facsimile: (301) 220- 1214
BMarkovitz@jgllaw.com
*(pro hac vice admission anticipated)*

Peter Winebrake
R. Andrew Santillo
THE WINEBRAKE LAW FIRM, LLC
Twining Office Center, Suite 211
715 Twining Road
Dresher, PA 19025
Phone: (215) 884-2491
Facsimile: (215) 884-2492
PWinebrake@winebrakelaw.com
ASantillo@winebrakelaw.com
*(pro hac vice admission anticipated)*

*Attorneys for Relator LaValley*

71